# UNITED STATES DISTRICT COURT

# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br>v.<br><br>DAVID SIDOO, et al.,<br><br>      Defendants. | Case No. 19-cr-10080-NMG<br>(Leave to file granted 12/19/2019) |

**MEMORANDUM IN SUPPORT OF DEFENDANT WILLIAM MCGLASHAN, JR.'S MOTION TO COMPEL THE PRODUCTION OF MATERIALS PURSUANT TO _BRADY V. MARYLAND_ AND FEDERAL RULE OF CRIMINAL PROCEDURE 16**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................... 1

FACTUAL BACKGROUND ........................................................................................ 5

    A.    McGlashan Engaged Singer, A Well-Reputed College Counselor At The Time, For Counseling And Test Prep ........................................................................ 5

    B.    Singer Presented The "Side Door" Option To McGlashan And McGlashan Declined To Pursue It ............................................................................... 8

PROCEDURAL BACKGROUND ............................................................................ 12

    A.    The Government Charges And Arrests 32 Parents In March 2019 ................... 12

    B.    The Government Secures Guilty Pleas From Some Parents And Indicts The Remaining 19 ................................................................................................ 13

    C.    The Government Produces Discovery ............................................................. 14

    D.    The Court Rejects The Government's Theory Of Guidelines Based On Amount Of Alleged Bribes Paid And The Government Supersedes To Add Bribery Charges ........................................................................................................ 14

    E.    McGlashan Repeatedly Requests Discovery And The Government Mostly Declines To Produce Or Even Admit That Materials Exist............................... 15

THE COURT SHOULD COMPEL PRODUCTION OF BRADY AND  RULE 16 MATERIALS ........................................................................................................... 19

    A.    Legal Standard ............................................................................................... 20

    B.    Requested Materials ...................................................................................... 22

        (i)    Category 1: Evidence That McGlashan Did Not Understand Either Scheme To Involve Bribery .................................................................. 23

        (ii)    Category 2: Evidence That McGlashan Did Not Participate In The Side Door Scheme .................................................................................... 26

        (iii)    Category 3: Evidence Relevant To An Entrapment Defense................. 27

        (iv)    Category 4: Evidence That USC Was Not The Victim Of Fraud ........... 28

        (v)    Category 5: Grand Jury Transcripts Regarding McGlashan's Alleged Bribery And Wire Fraud ........................................................................ 29

**TABLE OF CONTENTS (cont.)**

**Page**

CONCLUSION..................................................................................................................30

- ii -

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Brady v. Maryland*,
    373 U.S. 83 (1963) ......................................................................................... 20

*Ferrara v. United States*,
    384 F. Supp. 2d 384 (D. Mass. 2005) .......................................................... 27

*Freeman v. United States*,
    284 F. Supp. 2d 217 (D. Mass 2003) ........................................................... 22

*Kyles v. Whitley*,
    514 U.S. 419 (1995) ....................................................................................... 20

*Strickler v. Greene*,
    527 U.S. 263 (1999) ....................................................................................... 26

*United States v. Abbott*,
    19-cr-10117-IT .................................................................................... 13, 14, 15

*United States v. Agurs*,
    427 U.S. 97 (1976) ......................................................................................... 21

*United States v. Bagley*,
    473 U.S. 667 (1985) ....................................................................................... 21

*United States v. Baker*,
    2015 WL 8216041 (D. Mass. Dec. 8, 2015) ........................................... 24, 29

*United States v. Bravo-Fernandez*,
    239 F. Supp. 3d 411 (D.P.R. 2017) ............................................................... 30

*United States v. Brien*,
    617 F.2d 299 (1st Cir. 1980) ......................................................................... 28

*United States v. Duval*,
    496 F.3d 64 (1st Cir. 2007) ........................................................................... 26

*United States v. Godfrey*,
    2013 WL 1414887 (D. Mass. 2013) .............................................................. 23

*United States v. Isackson and Isackson*,
    19-cr-10115-PBS .............................................................................................. 13

## TABLE OF AUTHORITIES (cont.)

**Page(s)**

*United States v. LaPlante*,
    714 F.3d 641 (1st Cir. 2013) ........................................................................ 28

*United States v. Luthra*,
    2016 WL 5946864 (D. Mass. 2016) ............................................................ 24

*United States v. MacFarlane*,
    19-cr-10131-NMG ........................................................................................ 13

*United States v. Mariano*,
    983 F.2d 1150 (1st Cir. 1993) ...................................................................... 24

*United States v. Martinez*,
    710 F. Supp. 415 (D.P.R. 1989) .................................................................. 30

*United States v. O'Brien*,
    2013 WL 1057929 (D. Mass. March 13, 2013) .................................... passim

*United States v. O'Brien*,
    994 F. Supp. 2d 167 (D. Mass. 2014) ........................................................ 24

*United States v. Olsen*,
    704 F. 3d 1172 (9th Cir. 2013) .................................................................... 21

*United States v. Owens*,
    933 F. Supp. 76 (D. Mass. 1996) ................................................................ 26

*United States v. Pesaturo*,
    519 F. Supp. 2d 177 (D. Mass. 2007) ............................... 20, 21, 22, 26, 28

*United States v. Poulin*,
    592 F. Supp. 2d 137 (D. Me. 2008) ............................................................ 22

*United States v. Prochilo*,
    629 F.3d 264 (1st Cir. 2011) ...................................................................... 20

*United States v. Rosario-Peralta*,
    175 F.3d 48 (1st Cir. 1999) .................................................................. 22, 30

*United States v. Safavian*,
    233 F.R.D. 12 (D.D.C. 2005) ...................................................................... 21

*United States v. Sampson*,
    2016 WL 11574030 .................................................................................... 23

## <u>TABLE OF AUTHORITIES (cont.)</u>

<u>**Page(s)**</u>

*United States v. Snell*,
    899 F. Supp. 17 n.11 (D. Mass 1995) ........................................................................ 22, 26

**<u>Statutes</u>**

18 U.S.C. § 666(a)(2) ............................................................................................................. 14

18 U.S.C. § 1349 .................................................................................................................... 28

18 U.S.C. § 3500 .................................................................................................................... 23

**<u>Rules</u>**

Fed. R. Crim. P. 6(e)(3)(E)(ii) .............................................................................................. 30

Fed. R. Crim. P. 16(a)(1)(E) ................................................................................................. 20

Local Rule 116.1 .................................................................................................................... 20

Local Rule 116.2 .................................................................................................................... 20

Defendant William E. McGlashan, Jr. respectfully submits the following memorandum in support of his motion seeking a Court order requiring the Government to comply with its discovery obligations pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny, Federal Rule of Criminal Procedure 16, and Local Rules 116.1(c)(1)(A) and 116.2.

## INTRODUCTION

On March 12, 2019, William McGlashan, Jr. ("McGlashan") was arrested at his home as part of the massive roundup that captured national attention as the "Varsity Blues" college admissions scandal.  McGlashan has pleaded not guilty to the charges against him.  During the press conference that followed the arrests, the Government took pains to paint all the defendants with the same broad brush and emphasized that the true essence of the crime was that these rich defendants—a "catalog of wealth and privilege"—were able to purchase college admissions for their "far less qualified" children that the students could not have obtained on their own.[1] According to the Government, the goal of Rick Singer's scheme was "to secure admission to the children of his clients not on their merits but through fraud."  This included, as described in the accompanying press release, "having the children purport to have learning disabilities in order to obtain the required medical documentation"[2] and making payments to University of Southern California ("USC") coaches and administrators to secure admission to the university through a "side door."  Indeed, as part of their presentation of evidence against McGlashan at his initial

---

[1] *At This Hour* (Transcript), CNN, http://edition.cnn.com/TRANSCRIPTS/1903/12/ath.02.html (last visited Dec. 16, 2019).

[2] *Arrests Made in Nationwide College Admissions Scam: Alleged Exam Cheating and Athletic Recruitment Scheme*, The United States Attorney's Office District of Massachusetts, https://www.justice.gov/usao-ma/pr/arrests-made-nationwide-college-admissions-scam-alleged-exam-cheating-athletic (last visited Dec. 16, 2019).

appearance in this district, the Government alleged a discrepancy between "the ACT score in the 99th percentile that was taken by the proctor, [3] which is far higher than what the Defendant's son obtained himself on, I believe, the practice SAT."[4]  In other words, the Government's public statements led the public and court to believe that McGlashan faked his child's learning disabilities, bought him a test score he could not achieve, and purchased his way into a college that would not have otherwise admitted him.

The actual facts are far less favorable to the Government.  As later-produced discovery proves, McGlashan's son had been diagnosed with a learning disability—a form of dyslexia— long before Singer's unsuccessful attempt to sell McGlashan on the side door scheme, and had the intellectual capacity both to score well on the ACT and gain admission to college through legitimate routes.  Importantly, McGlashan's son was not submitted through the side door because McGlashan chose not to pursue the side door.  McGlashan did not pay Singer a single cent in connection with the side door, which makes him unique among all the defendants charged by the Government with the side door scheme.

To obfuscate these inconvenient facts, the Government represented in this Court at McGlashan's initial appearance that "[t]he only thing that prevented [McGlashan] from going forward with the side door is because he was informed at the end of October that Mr. Singer was under investigation by the IRS and other law enforcement for such fraud."[5]  Yet, based on

---

[3] As described *infra p. 7*, the Government's discovery proves that, contrary to the Government's assertions in court, the test was taken by McGlashan's son, not the proctor.

[4] Initial Appearance Tr., ECF No. 229 at 16:9-12.

[5] Initial Appearance Tr., ECF No. 229 at 18:10-13.

discovery that McGlashan has painstakingly elicited from the Government since then, the Government made this statement with, at least, reckless disregard for the truth.

For months, McGlashan unsuccessfully tried to persuade the Government of its duty to produce the FBI 302s and other evidence supporting his defenses, including that he did not participate in the side door.  The Government stonewalled, producing nothing—not even admitting whether or not such materials existed—before finally admitting at a meet and confer in October 2019 that it had still not reviewed the full set of materials in its possession for exculpatory *Brady* evidence.  Yet, rather than expeditiously complying with its discovery obligations under the local rules, the Federal Rules of Criminal Procedure, and caselaw, the Government instead chose to file a Third Superseding Indictment ("TSI"), adding conspiracy to commit federal programs bribery and substantive wire fraud counts to the conspiracy charges McGlashan was already facing.  These new charges do not appear to be based on any new evidence, and yet the new indictment makes a new and clearly erroneous fact assertion.

Finally on October 31, 2019, over 7 months after arresting McGlashan and only after filing the TSI, the Government at last disclosed a single sentence admitting that McGlashan had rejected Singer's side door scheme at least one month prior to being informed that Singer was under investigation: "In an interview on or about September 27, 2018, Singer advised agents, in sum and in substance, that your client would not be using the side door, but would be 'going through his own connections.'"[6]  This admission flatly contradicted the Government's prior public statement suggesting that McGlashan only decided against the side door because he learned of the Government investigation in October 2018.  It also directly supported

---

[6] Oct. 31, 2019 Letter from Kristen A. Kearney, attached as Ex. 1 at 2.  All citations to "Ex." refer to exhibits attached to this memorandum.

McGlashan's claim of factual innocence with regard to the "side door" scheme.  Nonetheless, the Government still maintained that it was not obligated to produce this information and related materials under *Brady*.

The Government's insistence that it is not obligated to produce anything further under *Brady* has been its only consistent position regarding the outstanding discovery pertaining to McGlashan.  Even in its most recent letter of November 27, 2019, in which it disclosed seven distinct paragraphs summarizing information from various reports, the Government emphatically maintained that <u>none</u> of the information constituted *Brady*.[7]  However, these disclosures provided further exculpatory information that undermined many of the Government's theories and directly contradicted previous public statements with respect to McGlashan.  For example, despite the Government's statements that McGlashan's son could not have achieved the ACT score at issue on his own merits, an administrator at McGlashan's son's high school had told the Government that McGlashan's son was "very smart" and a score of 34 was "not crazy."  Another disclosure revealed that McGlashan's son had been placed on a "VIP list," a list USC maintained as part of its established admissions process to identify students from families that could provide substantial donations to the school or had relationships with other influential persons affiliated with USC.

Without admitting to the existence of any materials, the Government has otherwise asserted a panoply of objections, including that McGlashan's requests seek information "that is neither relevant nor material to the crimes charged."[8]  This included requests for materials that

---

[7] Nov. 27, 2019 Letter from Kristen A. Kearney, attached as Ex. 2 at 2.

[8] Ex. 1 at 2.

- 4 -

would demonstrate that McGlashan's son's test scores were not changed—despite the Government's own reliance on the purported discrepancy between his ability and his allegedly purchased test score.  Even with its recent, limited disclosure, the Government has still refused to give anything other than minimal "sum and substance" summaries of select 302s.  As a result, McGlashan moves to compel the full reports underlying the summaries the Government has divulged to-date, as well as additional exculpatory and material evidence in the Government's possession related to his knowledge and intent with respect to Singer's schemes.  This additional exculpatory and material evidence may include, without limitation, full reports of any of the Government's interviews concerning McGlashan or his son, including any interviews with USC admissions or athletic personnel (such as the Marin Academy USC admissions representative referenced in the Government's most recent letter).[9]  McGlashan also seeks the grand jury transcripts associated with the TSI because certain allegations in the TSI raise troubling questions about irregularities in the grand jury proceedings.

## FACTUAL BACKGROUND

**A.      McGlashan Engaged Singer, A Well-Reputed College Counselor At The Time, For Counseling And Test Prep**

In 2015, almost two years before McGlashan and Singer met, a pediatric neuropsychologist diagnosed McGlashan's son with learning disabilities. VB-RECORDS-00331297.  The neuropsychologist recommended that McGlashan's son receive testing

---

[9] Other discovery in the Government's production indicates that the Marin Academy USC admissions representative is Yamilet Medina-Lopez.  *See* VB-RECORDS-00331460 at VB-RECORDS-00331575.  McGlashan has not located in the Government's productions discovery related to her email communications or any discussions the Government may have had with her.

accommodations, including extra time and an "alternate (quiet) testing environment" for both standardized and non-standardized tests. *Id.*

It was not until March 2017 that a third party introduced McGlashan to Singer. USAO-VB-00060141. Singer ran Key Worldwide Foundation ("KWF"), which was legally registered as a nonprofit entity, and which Singer represented to be an organization aimed at providing education to underprivileged students. Singer also came highly recommended for his tutoring platform, the Key, and would frequently reference his connections with high-profile families (such as "the wealthiest families in the U.S.," executives from Microsoft, Goldman Sachs, and Apple, and NBA and NFL owners). *See, e.g.,* Sessions 782, 3261, 5340. Singer would also frequently mention his connections to top university administrators, such as the president of Harvard, or the fact that he was hired by USC's president and board several years ago to change the university's image and brand. *See, e.g.,* Sessions 3787, 5340, 7629. Singer first began working with McGlashan's son in mid-2017, prior to his junior year of high school. For well over a year, and consistent with the purpose for which McGlashan had hired him, Singer provided legitimate college counseling and related services to McGlashan's son: Singer explained the college admissions process; arranged for subject matter tutors; and arranged for test prep. *See, e.g.,* USAO-VB-0041250; VB-RECORDS-00354408.

In September 2017, with the recommendation of his neuropsychologist, McGlashan's son applied for and received double time accommodation for the ACT based on the neuropsychologist's original assessment that had been completed in 2015. VB-RECORDS-00331460 at VB-RECORDS-00331772-74 and VB-RECORDS-00331497-99. Singer represented that he controlled a testing facility in West Hollywood. Compl. ¶ 30(b). Although McGlashan's son was registered to take the exam later in December, Singer's West Hollywood

center offered a date that was before finals and not during the holiday break, and therefore better for McGlashan's son's schedule.  VB-RECORDS-00331460 at VB-RECORDS-00331503-04. An administrator at McGlashan's son's school described this as a "great new option for him since it will be pre-finals for him."  *Id.*  McGlashan's son took the ACT on December 9, 2017 at the West Hollywood Testing Center, with his permitted time accommodation.  VB-RECORDS-00295879.  Nobody took the ACT for him.

At Singer's direction, McGlashan made a $50,000 donation to KWF shortly before his son took the ACT.[10]  McGlashan made his donation through Schwab Charitable, which independently vetted and approved KWF, including confirming its nonprofit status with the IRS.[11]  RCTRL0000000279 at SCH000234.

The Government alleges that after McGlashan's son completed the exam, Singer's associate Mark Riddell ("Riddell") changed the answers on McGlashan's son's test.  TSI ¶ 169. Other than the summaries of Singer's and Riddell's post-cooperation statements contained in the Complaint, however, the Government has produced no evidence—not even FBI 302 Reports of those statements—that Riddell corrected the answers on McGlashan's son's exam.[12]

---

[10] McGlashan regularly donated to charitable organizations.  In 2017 alone, he donated over $300,000 just from his Schwab Charitable fund, including $70,000 to Marin County Day School and $72,500 to Marin Academy, his children's schools, as well as $50,000 to the Maasai Wilderness Conservation Fund.  RCTRL0000000279 at SCH000160, SCH000174, SCH000190, SCH000198.

[11] McGlashan had a donor-advised account at Schwab Charitable which allowed him to make recommendations about grants to charitable organizations, but the final decisions were made by Schwab Charitable, which performed due diligence in addition to verifying IRS nonprofit status. RCTRL0000000279 at SCH000053, SCH000082; *Frequently asked questions*, Schwab Charitable, https://www.schwabcharitable.org/public/charitable/features/faqs (last visited Dec. 16, 2019).

[12] In a consensually recorded telephone call between Singer and McGlashan on October 24, 2018 (after Singer had begun cooperating with the Government), Singer alluded to his payment to

McGlashan's son received a score of 34 on the exam.  Compl. ¶ 140.  McGlashan's son was not aware of any donation his father might have made to Singer prior to that exam, or that anyone might have changed his answers.  Ex. 2.  In September 2019, McGlashan's son retook the ACT for the first time since the exam at issue—he earned a composite score of 33, a score in the 98th percentile.[13]  MCG_00000001.

McGlashan's son submitted college applications containing his ACT score in October and November 2018.  *See* USAO-VB-01107548; VB-RECORDS-00127946.  One of those applications was to Northeastern University in Boston.  USAO-VB-01107548.  Although McGlashan has been charged with wire fraud in connection with his son's transmittal of the allegedly falsified test score to Northeastern, McGlashan was unaware that his son was planning to or had applied to Northeastern until well after he had done so.  The Government has produced no evidence to the contrary.

**B.**     **Singer Presented The "Side Door" Option To McGlashan And McGlashan Declined To Pursue It**

On July 30, 2018, as McGlashan's son was preparing to enter his senior year, McGlashan and Singer had an update call regarding McGlashan's son's college applications.  Session 4146.  McGlashan expressed strong optimism regarding his son's prospects: "He feels really good…his grades have been sort of dramatically improving…He's engaging.  His internships have been brilliant."  *Id.*  McGlashan had also been engaging his VIP connections at USC, including friends

---

Riddell.  During that portion of the telephone call, and even when Singer falsely stated that Riddell took the test for his son, McGlashan's only responses were "Mm-hmm." RCTRL0001014554.

[13] According to the ACT, a composite score of 33 represents a "true achievement on [the] test" within a range of 32-34.  MCG_00000001.

on the board.  *Id.*  Specifically, McGlashan's son had already met a Senior Associate Dean at the

Iovine & Young Academy, the specific school within USC in which he was interested, and

McGlashan had set up a lunch and tour for his son with the Dean of Iovine so that his son could

get to know more about the school.  *Id.*  McGlashan wanted Singer's advice on how to navigate

the application process.  *Id.*  Instead of providing advice and encouragement, Singer stoked

McGlashan's anxiety by underplaying the chances of admission.[14]  He then introduced the side

door option.  *Id.*  In this same conversation, Singer also instructed McGlashan to stop reaching

out to his contacts on the USC Board if he was considering the "side door option" because those

two routes should not be pursued simultaneously.  *Id.*

That July 30, 2018 call was the only time Singer ever described the financial arrangement

involved in the "side door" in any detail.  He explained it as an option where McGlashan would

pay $250,000, and his son would be accepted to USC.  Singer described the payment structure as

an initial payment of $50,000, which "goes to [USC] Women's Athletics" to be followed with

---

[14] Singer's modus operandi was to frighten parents into believing that their children had no chance of getting into college without him.  *See, e.g.,* Jennifer Levitz and Melissa Korn, *'Nope, You're Not Special.' How the College Scam Mastermind Recruited Families*, The Wall Street Journal (Sept. 6, 2019, 11:01 AM), https://www.wsj.com/articles/nope-youre-not-special-how-corrupt-college-counselor-recruited-families-11567782077 (last visited Dec. 16, 2019); Session 7089 - RCTRL0001108307 (Parent: "What would her chances be without this [side door] process?  Singer: Zero.  Parent: She won't get in?  Singer: Zero.  She has zero chance.").  In fact, since his mother was an USC alum (VB-RECORDS-00127946), McGlashan's son had a high likelihood of admission based on his legacy status alone.  Legacies were admitted to USC in 2018 at twice the rate of non-legacy students.  *See* USC Trojan Family Magazine staff, *Who Was Accepted Into USC's 2018 Freshman Class?* (Autumn 2018), https://news.usc.edu/trojan-family/usc-acceptance-rate-2018-most-selective/ (last visited Dec. 16, 2019).  McGlashan's son was also coded as a VIP, and VIP admits were routinely admitted to the school at high percentage rates, including possibly up to 90%.  *See, e.g.,* USAO-VB-01428140; USAO-VB-01328890; USAO-VB-01253145; USAO-VB-01149284.  Students could receive a VIP designation in connection with donations as low as $25,000, or even being related to someone who was a potential donor.  *See, e.g., id.;* USAO-VB-01262296.

- 9 -

"the other 200." *Id.* Singer never described a bribe or that the money would go anywhere other than USC—and certainly never that money would be directed to any specific individual.

McGlashan and Singer discussed the "side door" off and on through August and September 2018 before McGlashan decided not to go through with it. McGlashan's son was never aware of these conversations or the possibility of the "side door." Session 4146; Ex. 2. As part of these discussions and at Singer's request, McGlashan sent Singer an unofficial transcript, test scores, and photos of his son in a casual t-shirt, basketball shorts, and an earring standing and running around what appears to be a backyard. DOJ-SINGER-TIII-00013131; USAO-VB-01069049; USAO-VB-01069435. In early September, Defendant Laura Janke created an athletic profile of McGlashan's son using a picture of someone else. USAO-VB-01093901; USAO-VB-01093906. The profile was never sent to McGlashan for his review or approval. Nor was the profile ever used as part of any application or submission on behalf of McGlashan's son. VB-RECORDS-00124873. This is because McGlashan—before reaching any final agreement with Singer—decided not to proceed with Singer's side door scheme and instead to pursue another path.

Only because of McGlashan's repeated requests for *Brady* material has evidence now come to light that by September 27, 2018, McGlashan had advised Singer that he did not want to move forward with the side door and was going to engage with USC through his own contacts. Singer conveyed this information to the Government on September 27, 2018.[15] Ex. 1 at 2. Singer later conveyed the same information to Donna Heinel, then the USC senior associate

---

[15] As discussed at length below, the Government did not disclose this information to McGlashan until October 31, 2019, after McGlashan had requested exculpatory materials on at least four occasions.

athletic director, on October 16, 2018.  DOJ-SINGER-TIII-00028907 (McGlashan has "family ties with Jimmy Lovine (sic) and various board members and is going that route.").  McGlashan indeed reached out to his friends after he decided not to pursue the side door—Singer had told him the paths were mutually exclusive—informing his contacts that USC was his son's first choice, and securing letters of recommendation and support from USC and Iovine & Young Board Members.  *See, e.g.,* VB-RECORDS-00158682; VB-RECORDS-00160069; RCTRL0000000017; VB-RECORDS-00295879.

On October 24, 2018, Singer, who unbeknownst to McGlashan was by then cooperating with the Government, called McGlashan on a consensually recorded line from the United States Attorney's Office in an attempt to secure inculpatory statements.  Unaware of Singer's circumstances, McGlashan instead took the opportunity to confirm that from his perspective they "sorta ha[dn]'t done anything yet" and politely reiterated that he would not be using the side door.  RCTRL0001014554.

McGlashan's son was never presented to the USC athletics subcommittee.  VB-RECORDS-00124873.  Instead, McGlashan's son was labeled as a legitimate VIP applicant, consistent with McGlashan's efforts to engage with his own USC connections, as Singer had communicated both to the Government and to Heinel.  Exs. 1 and 2; VB-RECORDS-00331460 at VB-RECORDS-00331575; DOJ-SINGER-TIII-00028907.  Prior to receiving an admissions decision, McGlashan's son withdrew his application.  He was never admitted to USC.[16]

---

[16] According to the Government's charging documents, of all the children of the parents charged with participating in the "side door," McGlashan's son is the only one who did not receive even conditional admission.

- 11 -

Crucially, McGlashan never paid a single dollar in connection with Singer's "side door" scheme.[17]

## PROCEDURAL BACKGROUND

### A.      The Government Charges And Arrests 32 Parents In March 2019

On March 11, 2019, the Government filed a criminal complaint ("Complaint") charging McGlashan and 31 other parents with conspiracy to commit mail fraud and honest services mail fraud. [18]  ECF No. 3.  The Government arrested the vast majority of the parents on the morning of March 12, 2019, including McGlashan, at his home in Northern California.  Relying substantially on information provided by Singer and Riddell (referred to as "CW-1" and "CW-2"), the Complaint charged McGlashan with making a $50,000 donation to KWF "with the understanding that [Singer] would arrange for [Riddell] to serve as a purported proctor" for McGlashan's son at a test center that Singer "controlled" so that Riddell would, "in exchange for money, correct [McGlashan's] son's answers after the test was completed."  Compl. ¶¶ 132, 136.

The Complaint also charged McGlashan with agreeing to participate in the "side door" college recruitment scheme, relying largely on the July 30, 2018 call where Singer introduced the "side door" option.  Compl. ¶ 142.  Singer stated, "so, in this path, you'd pay 250.  You'd get accepted."  *Id.*  Later in the call, Singer elaborated that it would start with "just a $50,000 check, and it goes to Women's Athletics…. And then the other 200 comes in March."  *Id.*

_____

[17] This makes McGlashan unique among all of the defendants charged with the "side door" scheme.  According to the Government's charging documents, every other parent made at least one payment to participate in Singer's scheme.

[18] McGlashan had never met nor heard of most of the other parents.  The only parent he knew personally was Defendant Agustin Huneeus, whose daughter attended the same school as McGlashan's son, but McGlashan did not introduce Singer and Huneeus (*see* USAO-VB-00029755), and McGlashan avoided discussing Singer with Huneeus (*see* Session 7218).

During McGlashan's initial appearance in this district on March 29, 2019, the

Government argued that McGlashan should not be allowed to take a family vacation to Mexico

because of a risk of flight.  Arguing that the penalties were stiff and the evidence was

"overwhelming," it recited its theory of McGlashan's exploration of the side door and stated that,

"The only thing that prevented him from going forward with the side door is because he was

informed at the end of October that Mr. Singer was under investigation by the IRS and other law

enforcement for such fraud."[19]  *See* Initial Appearance Tr., ECF No. 229 at 18:10-13.

### B.      The Government Secures Guilty Pleas From Some Parents And Indicts The Remaining 19

On April 8, 2019, the Government filed an information against 11 defendants who had

signed plea agreements.  *United States v. Abbott, et al.*, 19-cr-10117-IT, ECF Nos. 312-323.

That same day, the Government filed a separate information against Bruce and Davina Isackson,

who signed cooperation plea agreements.  *United States v. Isackson and Isackson*, 19-cr-10115-

PBS, ECF Nos. 313-15.  Toby MacFarlane pled, trailing the main group, and was charged in a

separate case.  *United States v. MacFarlane*, 19-cr-10131-NMG, ECF Nos. 317-18. The first of

the parent defendants signed his plea agreement on April 2, 2019.  *Abbott, et al.*, ECF No. 319.

The remaining defendants, including McGlashan, were joined in the instant case by either

the First or Second Superseding Indictment, which the Government filed on March 26, 2019 and

April 9, 2019, respectively.  ECF Nos. 119, 314.

---

[19] As discussed *supra* p. 10, Singer had actually advised the Government a full month prior that
McGlashan was not pursuing the side door.

C.      **The Government Produces Discovery**

The Government provided very little discovery to defendants before securing their

pleas—not even transcripts of the calls with Singer.  *See, e.g.,* Def. Sloane's Sentencing

Memorandum, *Abbott et al.*, 19-cr-10117-IT, ECF No. 454 at 1; Caplan Sentencing Hearing Tr.,

*Abbott et al.*, 19-cr-10117-IT, ECF No. 510 at 15:18-21:21.  For the indicted defendants, the

Government began producing automatic discovery on May 12, 2019.  Included in the production

were emails, text messages, and voicemails from Singer's telephone and email accounts, audio

and video recordings, some rough transcript recordings, surveillance photos, historical cellsite

data, plea agreements from cooperating witnesses, and financial records.  The Government has

since made four supplemental productions.  To-date, the Government still has not provided any

notes, memoranda, or FBI 302 Reports regarding any of its cooperating witnesses.

D.      **The Court Rejects The Government's Theory Of Guidelines Based On
        Amount Of Alleged Bribes Paid And The Government Supersedes To Add
        Bribery Charges**

Judge Talwani sentenced the first set of parents in the *Abbott* case in September and

October 2019.  *United States v. Abbott, et al.*, 19-cr-10117-IT.  As part of the plea agreements,

the parents stipulated to loss enhancements under USSG § 2B1.1(b) based on the amount of

payments made in each case.  However, the Probation Office concluded that the affected

universities and testing centers had suffered no pecuniary harm from the parents' actions and that

consequently there should be no loss enhancement, based on payment amounts or any other point

of reference.  In response, the Government filed a Sentencing Memorandum arguing that the

court should calculate the guidelines with reference to the bribery guidelines.  The Government

specifically noted the potential applicability of 18 U.S.C. § 666(a)(2), which criminalizes fraud

and bribery schemes for certain organizations.  *Abbott et al.*, ECF No. 420 at 16.  The court

rejected the Government's suggestion, declining to calculate the guidelines based on the payments made and finding no pecuniary loss—with a resulting guidelines range of 0-6 months.[20]  *Abbott, et al.,* ECF No. 443.

On October 22, 2019, the Government filed its TSI, adding a conspiracy to commit federal programs bribery and a substantive bribery count, as well as substantive wire fraud counts against some defendants including McGlashan.  ECF No. 610.

> **E.      McGlashan Repeatedly Requests Discovery And The Government Mostly Declines To Produce Or Even Admit That Materials Exist**

On September 3, 2019, McGlashan provided the Government with a comprehensive, specific list of requests for *Brady* and Rule 16 materials. *See* Sept. 3, 2019 Letter from John C. Hueston, attached as Ex. 3.  Among others, the materials McGlashan sought included evidence tending to show that McGlashan believed that Singer's charitable organization, testing facility, and side-door admission approach were legitimate options; that he was manipulated by Singer; and that he never agreed to use Singer's side-door approach.  *See e.g.*, Requests 11, 31-36, 95, 97-98, 103-104, 106-109, 111-116, 122, 124-126.  McGlashan also requested documents evidencing when Singer's motivation to help the Government arose.  Requests 86-88.

The Government failed to respond to a single request, noting instead that it had "produced eight tranches of discovery thus far" and insisting that McGlashan had failed to make any "specific" *Brady* requests.  Sept. 16, 2019 Letter from Eric S. Rosen, attached as Ex. 4.  The Government further assured McGlashan that it was familiar with and would continue to comply with its *Brady* obligations. Lastly, the Government stated that it did not believe there was a valid

---

[20] To date, no parent defendant has been sentenced to more than half of the Government's recommended sentence.

entrapment defense and that any materials pertinent to such a defense would thus not be discoverable under Rule 16.

McGlashan reiterated his request for *Brady* and Rule 16 materials on September 24, 2019.  Sept. 24, 2019 Letter from John C. Hueston, attached as Ex. 5.  On September 24, 2019, the Government once again claimed that none of McGlashan's *Brady* requests were sufficiently specific.  Sept. 24, 2019 Email from Eric Rosen, attached as Ex. 6.

When counsel for McGlashan met and conferred with the Government in person a week later, however, the Government conceded that it had not actually reviewed McGlashan's requests, nor had it fully reviewed the documents in its possession for potential *Brady* material.  Oct. 8, 2019 Letter from John C. Hueston, attached as Ex. 7.  The Government agreed to review the remaining materials in its possession—including witness interview notes—and to produce any such materials containing *Brady*.  *Id.*  Following on the parties' meet and confer, McGlashan once again reiterated his requests for *Brady* material in writing.  *Id.*

Before the Government produced any more materials or provided any further response, it filed the TSI.  Identifying a clear factual inaccuracy[21] and other irregularities in the TSI, McGlashan wrote to the Government on October 23, 2019, supplementing his discovery requests with a request for the grand jury transcripts related to the TSI.  Oct. 23, 2019 Letter from John C. Hueston, attached as Ex. 8.  The Government did not deny that the one allegation in the TSI was factually inaccurate, but characterized it as a "clerical error" and disavowed that any "irregularities" had occurred.  Oct. 25, 2019 Letter from Eric S. Rosen, attached as Ex. 9.

---

[21] Paragraph 260 of the TSI charges "On or about August 25, 2018, McGLASHAN sent Singer his son's fraudulently obtained ACT score, his high school transcript, and photos of his son *in a football uniform*" (emphasis added).  The photos sent by McGlashan to Singer were of his son in a t-shirt and shorts—not a football uniform.  USAO-VB-01069435.

Over a week after filing the TSI, on October 31, the Government provided a further response to McGlashan's original discovery requests. Ex. 1. However, it ignored all of McGlashan's Rule 16 requests and denied that it had an obligation to provide the majority of the *Brady* materials requested by McGlashan. *Id.* Among other claims, the Government asserted that because certain pieces of directly exculpatory materials could also undermine the credibility of the Government's witnesses—namely Singer—those materials were *Giglio* information not subject to production until 21 days before trial under the Local Rules.[22] Ex. 1. The Government also took the position that several of the categories sought—such as documents showing that "none of the answers on McGlashan's son's ACT exam were changed"—were "neither relevant nor material to the crimes charged." Ex. 1 at 2; Ex. 3 at 11.

The sole disclosure contained in the Government's letter was that "on or about September 27, 2018, Singer advised agents, in sum and in substance, that your client would not be using the side door, but would be 'going through his own connections.'" Ex. 1.

In anticipation of filing this motion, and in the spirit of Local Rule 7.1(a)(2), McGlashan responded to the Government for the final time on November 15, 2019, outlining his understanding of the Government's position with respect to each of his specific requests. Nov. 15, 2019 Letter from John C. Hueston, attached as Ex. 10. McGlashan asked the Government to correct any mischaracterizations of its position. *Id.* The letter also disputed the Government's characterization of its *Brady* obligations and challenged its right to make relevancy calls on

---

[22] For example, to undermine the Government's allegation that McGlashan had the specific intent to defraud the ACT, McGlashan sought witness statements showing that Singer "misled McGlashan about the nature of his relationship with ACT, Inc. or about the nature of any of his affiliates' relationships with ACT, Inc." Ex. 3 at 10. Such materials would be directly exculpatory under *Brady*, even if they also cast doubt on Singer's credibility under *Giglio.*

McGlashan's behalf. *Id.* In a separate letter, McGlashan also reiterated his request for Grand Jury transcripts and explained why he believed there were irregularities in the indictment worth examining. Nov. 15, 2019 Letter from John C. Hueston, attached as Ex. 11.

On November 27, 2019, the Government responded to both letters. In a brief letter, the Government declined to provide the grand jury transcripts. Nov. 27, 2019 Letter from Eric S. Rosen, attached as Ex. 12. Addressing the discovery issues separately, it declined to confirm or deny its position on any individual request. Ex. 2. Instead, the Government simply asserted that it believed it had satisfied its Rule 16 obligations and, should it come into possession of further materials, would produce them in a timely manner. *Id.* Despite beginning with a blanket statement that McGlashan had not adequately justified his *Brady* requests and specifying that it did not believe "<u>any</u> of the information set forth… constitutes *Brady* material," the Government nonetheless disclosed seven paragraphs of information.[23] *Id.* Each paragraph purported to set forth the "sum and substance" of the statement of an individual about testing and/or the USC admissions process. *Id.* These summaries are insufficient, and do not provide all of the information or context that McGlashan is entitled to under the law. For six out of the seven statements, the Government did not even provide a rough approximation of the date of the communication. *Id.* Three addressed McGlashan's son's projected test scores, a topic the Government had previously deemed irrelevant. *Id.* The Government also provided additional

---

[23] The Government may have provided these disclosures to McGlashan as part of a broader effort to provide separate disclosures to each of the Defendants in *United States v. David Sidoo, et al.*. Nov. 27, 2019 Letter from Justin D. O'Connell, attached as Ex. 13. The Government indicated that none of those disclosures constituted *Brady,* either. *Id.* Several other defendants have also filed motions to compel in relation to the Government's position with respect to *Brady*. *See* Abdelaziz Mot. to Compel, ECF No. 648; Defendants' Mot. for Production, ECF No. 681; Giannulli and Loughlin Mot. to Compel, ECF No. 693. The Court has ordered *in camera* review of Abdelaziz's requested discovery. ECF No. 692.

information confirming that McGlashan's son was on the "VIP list" as opposed to an athletics list—further proof that McGlashan did not utilize the side door.  *Id.* at 2.  However, the Government provided only a single sentence regarding Riddell's statements:  "Mark Riddell has advised the government, in sum and in substance, Riddell generally allowed students whose exams he proctored to use their cell phones to advise their parents prior to beginning the final examination section that they were about to start the final section."  *Id.*  This summary includes no information regarding whether McGlashan's son completed the ACT in its entirety or whether Riddell claimed to have actually corrected answers on the exam.  The Government only provided three sentences summarizing Singer's statements, none of which addressed Singer's specific communications to McGlashan regarding any payments discussed, the purpose of such payments or where such payments would be directed.  *Id.* at 2-3.

## THE COURT SHOULD COMPEL PRODUCTION OF *BRADY* AND RULE 16 MATERIALS

Out of the Government's trickle of information, two things are clear: the Government is in possession of *Brady* materials it has not yet produced, and it will not turn over anything further without judicial intervention.  In every letter, even while refusing to confirm or deny the existence of any category of information or even specific identified evidence, the Government has maintained that it has met its discovery obligations and that *Brady* does not obligate it to make any further productions.  While it refuses to label its disclosures *Brady* (as though its unilateral withholding of that designation would shield its evidence from the defense), the actual contents make clear that they are highly relevant and material to McGlashan's defense.  The Court should compel the Government to produce all of the materials in its possession corresponding to the categories enumerated below, beginning with, at a minimum, the full reports containing the statements the Government has so far only summarized.

A.      **Legal Standard**

The Government has a constitutional "duty to disclose evidence in its possession that is favorable to the accused and material to guilt or punishment."  *United States v. Prochilo*, 629 F.3d 264, 266 (1st Cir. 2011) (citing *Brady v. Maryland*, 373 U.S. 83 (1963)).  The Government's disclosure obligations under *Brady* apply "regardless of request," so long as "favorable evidence is material."  *Kyles v. Whitley*, 514 U.S. 419, 433 (1995).  In this District, the Government must produce directly exculpatory *Brady* material within 28 days of arraignment.  *See* Local Rule 116.2(a)(1) (directing government to produce information that "tends to cast doubt on defendant's guilt" concerning any count in the indictment within the time designated in Rule 116.1(c)(1) or information that "tends to cast doubt on the credibility or accuracy of any evidence that the government anticipates using in its case-in-chief"); *see also* Local Rule 116.1(c)(1) (providing for production of documents within 28 days of arraignment). Similarly, under the Federal Rules of Criminal Procedure, the government must permit a defendant to inspect and copy documents (or copies or portions of the same) in the government's possession, custody, or control where (i) the item is material to preparing the defense; (ii) the government intends to use the item in its case-in-chief at trial; or (iii) the item was obtained from or belongs to the defendant.  Fed. R. Crim. P. 16(a)(1)(E).  Like directly exculpatory material, any evidence discoverable under Fed. R. Crim. P. 16(a)(1)(E) must be disclosed to the defendant within 28 days of arraignment.  Local Rule 116.1(c)(1)(A).

Courts have adopted an expansive reading of materiality in the context of *Brady* after recognizing the "difficulty [in] applying this formulation, crafted in the post-trial context, to the pretrial discovery setting."  *United States v. Pesaturo*, 519 F. Supp. 2d 177, 189 n.7 (D. Mass. 2007).  There is a "significant practical difference between the pretrial decision of the prosecutor

- 20 -

and the post-trial decision of the judge," and "the significance of an item of evidence can seldom be predicted accurately until the entire record is complete."  *United States v. Agurs*, 427 U.S. 97, 108 (1976).  As one court explained:

> The prosecutor cannot be permitted to look at the case pretrial through the end of the telescope an appellate court would use post-trial.  Thus, the government must always produce any potentially exculpatory or otherwise favorable evidence without regard to how the withholding of such evidence might be viewed-with the benefit of hindsight-as affecting the outcome of the trial.  The question before trial is not whether the government thinks that disclosure of the information or evidence it is considering withholding might change the outcome of the trial going forward, but whether the evidence is favorable and therefore must be disclosed.  Because the definition of "materiality" discussed in *Strickler* and other appellate cases is a standard articulated in the post-conviction context for appellate review, it is not the appropriate one for prosecutors to apply during the pretrial discovery phase.  The only question before (and even during) trial is whether the evidence at issue may be "favorable to the accused"; if so, it must be disclosed without regard to whether the failure to disclose it likely would affect the outcome of the upcoming trial.

*United States v. Safavian*, 233 F.R.D. 12, 16 (D.D.C. 2005); *see also United States v. Olsen*, 704 F. 3d 1172, 1183 n.3 (9th Cir. 2013) (a "trial prosecutor's speculative prediction about the likely materiality of favorable evidence … should not limit the disclosure of such evidence, because it is just too difficult to analyze before trial whether particular evidence ultimately will prove to be 'material' after trial.").  "[T]he more specifically the defense requests certain evidence, thus putting the prosecutor on notice of its value, the more reasonable it is for the defense to assume from the nondisclosure that the evidence does not exist, and to make pretrial and trial decisions on the basis of this assumption."  *United States v. Bagley*, 473 U.S. 667, 682-83 (1985).

Acknowledging these principles, courts in this district have erred on the side of requiring disclosure where a defendant is able to articulate how the evidence sought "tends to cast doubt" on an essential element of a charge.  *United States v. O'Brien*, 2013 WL 1057929, at *6 (D. Mass. March 13, 2013); *see also Pesaturo*, 519 F. Supp. 2d at 189 n.7 & 191 (D. Mass. 2007) (quoting with approval the pretrial test for disclosure articulated in *Safavian*—whether evidence

- 21 -

may be favorable to the accused—and granting motion to compel); *Freeman v. United States*, 284 F. Supp. 2d 217, 225 (D. Mass 2003) (rejecting government's argument that evidence which was not admissible was not material and finding that evidence was material and discoverable under *Brady* where it put the defense on notice of a "promising avenue of investigation"). Those courts have explained "since the *Brady* obligation is a constitutional one, the Government should err on the side of disclosure to the defense or laying out before the Court their considered and important reasons for nondisclosure." *See United States v. Snell*, 899 F. Supp. 17, *22 n.11 (D. Mass 1995). The Department of Justice also directs prosecutors to take a "broad view of materiality and err on the side of disclosing exculpatory and impeaching evidence." U.S. Dep't of Justice, Justice Manual § 9-5.001(B)(1), https://www.justice.gov/jm/jm-9-5000-issues-related-trials-and-other-court-proceedings (last visited Dec. 16, 2019).

Similarly, while the meaning of "materiality" within the context of a Rule 16 request remains unclear, courts grant motions to compel under Rule 16 where a defendant makes a prima facie showing that the materials sought are "significant to the preparation of the Defendant's defense." *Pesaturo*, 519 F. Supp. 2d at 189 n.7 & 191 (D. Mass. 2007); *United States v. Poulin*, 592 F. Supp. 2d 137, 143 (D. Me. 2008) (the "materiality" showing under Rule 16 "is not a heavy burden" and is one a defendant can meet by explaining why the evidence "may alter the quantum of proof" in his favor) (citation and internal quotation marks omitted).

## B.     Requested Materials

McGlashan has made detailed requests related to different aspects of his defense. Those requests and their significance to McGlashan's defense are grouped by general category below. The Court should compel the Government to provide these materials. *See United States v. Rosario-Peralta*, 175 F.3d 48, 52-56 (1st Cir. 1999) (district court abused its discretion in

- 22 -

denying motion to compel communication records and logs that supported defense theory, for

which defendants had asked several times prior to and during trial, without first conducting an in

camera review); *United States v. Sampson*, 2016 WL 11574030, at *1 (granting motion to

compel various forms of documents spanning nine years related to two general subject matters

because the defendant "provided the court with some indication that the materials to which he

need[ed] access contain[ed] material and potentially exculpatory evidence.").[24]

**(i)     Category 1: Evidence That McGlashan Did Not Understand Either
Scheme To Involve Bribery**

McGlashan hired Singer for legitimate counseling services.  The Government has

produced no evidence indicating that, prior to McGlashan's son taking the ACT, Singer

explained where the $50,000 donation would be directed or that Riddell would be correcting

McGlashan's son's test.  Similarly, in explaining the "side door" scheme, Singer never explained

that the money would be going to any individual, much less to facilitate a fraud as part of a quid

pro quo.  He explained only that the money would be going to a USC department—a financial

transaction that could be a legitimate donation.  Further materials confirming or concerning what

Singer told (or did not tell) McGlashan are critical to McGlashan's defense, but the Government

has specifically declined to provide those materials, asserting that they are *Giglio* or Jencks (18

U.S.C. § 3500) impeachment material.

---

[24] To the extent the Government contends that it has already produced any of the materials sought, McGlashan requests an affirmative statement that it has produced all such materials. *United States v. Godfrey*, 2013 WL 1414887 at *2 (D. Mass. 2013) (recognizing that Government may not hide requested Brady materials in a large-scale document production "in the hope that the defendant will never find it").

The First Circuit has made clear that bribes are intended "to effect a quid pro quo," whereas gratuities might be given after the desired action "as a reward for actions … already taken or [] already committed to take." *United States v. Mariano*, 983 F.2d 1150, 1159 (1st Cir. 1993).  The Government must show that McGlashan sought an "exchange," i.e., "a payment for an official act, or course of action." *United States v. O'Brien*, 994 F. Supp. 2d 167, 187 (D. Mass. 2014).  McGlashan is therefore entitled to evidence concerning whether he was even aware that money would be going from Singer or KWF to any other individuals to secure specific actions from them. *See United States v. Luthra*, 2016 WL 5946864, at *9 (D. Mass. 2016) (granting motion to compel documents which could explain that defendant acted for reasons unrelated to the alleged kickbacks she received because such documents were "exculpatory under *Brady* and [] 'material to preparing her defense' under [Rule 16].").

The communications from Singer and Riddell that the Government cited in the Complaint and relied upon to charge McGlashan with the testing scheme also constitute Rule 16 materials because they form the basis of the Government's case against McGlashan.  The same is true of any communications from Singer to the Government regarding conversations he had with McGlashan about the "side door."  The 302s of those conversations will likely confirm that McGlashan was misled by Singer—clear *Brady* exculpatory evidence.  Even if they do not, what Singer told McGlashan about the side door, and what was relayed to the Government about those conversations, is critical to the preparation of McGlashan's defense under Rule 16.  *See O'Brien*, 2013 WL 1057929, at *6; *United States v. Baker*, 2015 WL 8216041, at *6 (D. Mass. Dec. 8, 2015) (granting motion to compel "information in [the government's] possession … that might show that Defendant did not know that [his conduct was] illegal").  At a minimum, statements

they make that are inconsistent with McGlashan's recollection and other evidence would constitute *Giglio* impeachment information.

Encompassed in this category of requests are also materials showing that McGlashan's son legitimately needed the accommodations provided by Singer's facility and did not need (and therefore might not have used) Riddell to correct his answers. This includes not only any statement by Riddell that he did not correct McGlashan's son's answers, but the original version of the ACT test that the Government contends was later altered. Thus far (and despite making some limited disclosures in its latest correspondence),[25] the Government has taken the position that such materials are irrelevant, but that position does not square with the Government's own allegations. *Compare* TSI ¶ 59(a) (alleging that McGlashan and his co-defendants conspired to defraud the ACT by having their children "purport to have learning disabilities in order to obtain … extended time.") *with* Ex. 1 at 2 ("whether the defendant's son had a learning disability is irrelevant."). That his son did not need a false score "tends to cast doubt" on McGlashan's intent to defraud. *Cf. United States v. O'Brien*, 2013 WL 1057929, at *6 (D. Mass. March 13, 2019) (in case involving rigged hiring system, granting motion to compel evidence that defendants were qualified for the positions they held).

McGlashan is entitled to Rule 16 and *Brady* materials whether or not they appear in the form of FBI 302s, and whether or not they may also cast doubt on Singer's credibility. *See*

---

[25] As just one example of why the Government's undated, uncontextualized "sum and substance" disclosures are insufficient, the dates that a particular individual interacted with McGlashan's son are highly pertinent. One of the disclosures involves statements made by Luke Rickford about McGlashan's son's practice ACT exams. Given McGlashan's son's achievement on the retake of his ACT, the timing of Rickford's statements and of the practice tests is material: was Rickford talking about the earliest practice tests before McGlashan's son began preparing, or was Rickford either wrong or lying?

*United States v. Snell*, 899 F. Supp. 17, 19-21 (D. Mass. 1995) (concluding *Brady* material "must

be turned over immediately" notwithstanding Jencks Act because it is "inconceivable that a

statutory obligation should supersede a constitutional one"); *see also United States v. Owens*,

933 F. Supp. 76 (D. Mass. 1996) (compelling government to produce all exculpatory

information, including impeachment materials, even if covered by Jencks Act because "[w]here a

defendant's constitutional due process rights under *Brady* clash with the procedural dictates of

the Jencks Act, the [constitutional] rights afforded to the defendant must prevail"); *Pesaturo*, 519

F. Supp. 2d at 189 (granting pretrial motion to compel 302 Reports containing *Brady* and Rule

16 material); *O'Brien*, 2013 WL 1057929, at *5 (requiring government to produce exculpatory

information even if such material also qualified as Jencks Act material); *see also Strickler v.

Greene*, 527 U.S. 263, 282 n. 21 (1999) ("*Brady's* disclosure requirements extend to materials

that, whatever their other characteristics, may be used to impeach a witness.").[26]

> **(ii)** *Category 2: Evidence That McGlashan Did Not Participate In The Side Door Scheme*

Next, McGlashan seeks additional evidence reflecting the fact that he did not participate

in the side door scheme.  Despite repeated requests since September 2019, the Government has

---

[26] Even if the materials McGlashan sought were solely relevant for impeachment purposes, the First Circuit has disavowed the Government's narrow view that it is not required to promptly disclose *Giglio* information in its possession.  In *United States v. Duval*, the government failed to promptly disclose everything it knew regarding its confidential informants, instead repeatedly amending its disclosures to include "information that further cast doubt on the testimony of [] two of the Government's principal witnesses at trial."  496 F.3d 64, 73 (1st Cir. 2007). Characterizing those disclosures as "disclosures of potentially exculpatory evidence," the First Circuit noted that the government's conduct was a "clear violation of its Brady and Jencks Act obligations."  *Id.*  The court explained that "overly broad statements by the Government that all exculpatory information had been disclosed may have led [the defendants] to believe that the Government had in fact disclosed all that it knew, when it had not."  *Id.*  The court thus "took [the] opportunity to remind prosecutors that disclosure of Brady and Jencks Act material is not a suggestion, but a constitutional and statutory obligation."  *Id*.

so far produced only the one sentence regarding how Singer advised the government in September 2018 that McGlashan would not be using the side door.  *See Id.*; Ex. 1.  McGlashan needs, at a minimum, that full report, as well as any other reports or other documents confirming that he chose not to proceed.  *See O'Brien*, 2013 WL 1057929, at \*9 (granting motion to compel "reports, memorandum, and notes of all individuals who were interviewed informally" in connection with investigation).

Certainly, preceding Singer's communication with the Government, McGlashan would have conveyed his plans to Singer—also *Brady*—and that communication has not been produced.  *See Ferrara v. United States*, 384 F. Supp. 2d 384, 387-88, 423 (D. Mass. 2005) (government failed to disclose "highly material" exculpatory evidence and thus committed *Brady* error by withholding memorandum reflecting witness' admission that defendant did not participate in crime for which he was charged).  In the October 24, 2018 consensual recording, Singer and McGlashan also discuss a call from a couple days earlier: that call was not preserved or has not been produced.

### (iii)   *Category 3: Evidence Relevant To An Entrapment Defense*

Relatedly, McGlashan seeks documents, notes, or other information or evidence showing when the Government began using Singer as an agent or when Singer first suspected that he was being investigated by the Government.  Singer did not introduce the "side door" to McGlashan until the end of July 2018—less than two months before Singer signed a consensual monitoring agreement on September 27, 2018.  SINGER-VOL002-000378.[27]  Singer did not request the

---

[27] There is also a consensual monitoring letter to AT&T for Singer's telephone, 916-384-8802, dated September 20, 2018, advising AT&T of the Government's intent to proceed without court order in the case of consent to monitor.  SINGER-VOL002-000377.

picture of McGlashan's son until August 22, 2018.  Session 6577.  It seems likely that the

Government first made contact with Singer prior to the day that he first signed a consensual

monitoring agreement, and that Singer may have been aware of the investigation even prior to

that.  McGlashan is entitled to information regarding when Singer might have first had motive to

ensnare as many parents as possible into his scheme and develop evidence for the Government.

*See Pesaturo*, 519 F. Supp. 2d at 191 (granting motion to compel "information concerning the

informant's cooperation with the Government" as exculpatory under *Brady* and material under

Rule 16 because such evidence "support[ed] the Defendant's proffered entrapment defense,

which itself attack[ed] an essential element of the Government's case—i.e., the Defendant's state

of mind.").

### (iv)     *Category 4: Evidence That USC Was Not The Victim Of Fraud*

McGlashan next seeks documents or witness statements showing that USC was familiar

with Singer and his method of getting students admitted to USC, or that McGlashan believed as

much.  As part of the Conspiracy to Commit Mail Fraud and Honest Services Mail Fraud

charged under 18 U.S.C. § 1349, the Government must prove that McGlashan intended to

defraud USC of money, property, or honest services.  *See United States v. LaPlante*, 714 F.3d

641, 644 (1st Cir. 2013); *United States v. Brien*, 617 F.2d 299, 307 (1st Cir. 1980) ("The essence

of a [mail fraud] scheme is a plan to deceive persons as to the substantial identity of the things

they are to receive in exchange.").  Based on Singer's representations to McGlashan, McGlashan

believed that USC was aware of Singer and the candidates he submitted for special

consideration.  Evidence reflecting as much—or evidence reflecting that Singer told McGlashan

as much—would cast doubt on McGlashan's intent to defraud.  *See O'Brien*, 2013 WL 1057929,

at *7 (allowing motion to compel evidence that probation department allegedly defrauded by

- 28 -

defendants actually permitted consideration of legislative recommendations or sponsorships as a factor when determining which candidate was "most qualified" because such information was exculpatory and material); *Baker*, 2015 WL 8216041, at *6 (granting motion to compel information that called into question the extent of harm caused by the defendant's conduct, as well as information showing that defendant's illegal adjustments were "widely publicized" or that "other employees believed [them to be] legal, or accepted them without question").

      **(v)**      ***Category 5: Grand Jury Transcripts Regarding McGlashan's Alleged Bribery And Wire Fraud***

McGlashan also seeks the grand jury transcripts for the TSI to understand what evidence was presented to the grand jury to secure the bribery and wire fraud charges against him. Specifically, the allegations in paragraphs 259 and 260 raise questions about the Government's grand jury presentation on the bribery charge: paragraph 259 alleges that McGlashan agreed "to bribe USC athletic coaches and administrators," and paragraph 260 alleges that McGlashan sent photos of his son in a football uniform. As summarized above, no evidence in the Government's production to date supports any such specific agreement as referenced in paragraph 259, and McGlashan sent photos of his son in casual clothes, not a football uniform.

The Government also added a substantive wire fraud count against McGlashan, charging "[o]n or about October 24, 2018, the ACT score Riddell secretly obtained on behalf of McGlashan's son was submitted to various colleges and universities, via interstate wire communication, including Northeastern University in Boston, Massachusetts." TSI ¶¶ 178, 320. To date, the Government has not produced any evidence reflecting that McGlashan was even aware of—let alone responsible for—submitting his son's application to Northeastern.[28]

---

[28] The defense believes that Singer encouraged his son to apply to Northeastern, possibly at the Government's direction, and in order to establish venue in this District. Session 10406. On that

      - 29 -

These irregularities allow the Court to authorize disclosure of the transcripts to McGlashan.  *See* Fed. R. Crim. P. 6(e)(3)(E)(ii); *United States v. Martinez*, 710 F. Supp. 415, 416 (D.P.R. 1989) (presentation of false testimony before grand jury warranted dismissal of indictment where prosecutor was either negligent in allowing false testimony to go to grand jury or else condoned false testimony).  At a minimum, they provide a basis for the Court to review the transcripts in camera.[29]

## **<u>CONCLUSION</u>**

For the foregoing reasons, the Court should order the Government to produce the requested materials.

---

same consensually recorded call, which took place in October after Singer began cooperating, Singer also coaxed McGlashan's son to apply to Boston University, a school that had not otherwise been under consideration.

[29] *See Rosario-Peralta*, 175 F.3d at 52-56 (district court abused its discretion in denying motion to compel communication records and logs that supported defense theory, for which defendants had asked several times prior to and during trial, without first conducting an in camera review); *United States v. Bravo-Fernandez*, 239 F. Supp. 3d 411 (D.P.R. 2017) (granting in camera review of grand jury proceedings).

Dated: December 20, 2019                     Respectfully submitted,


                                             /s/ Jack W. Pirozzolo
John C. Hueston (*pro hac vice*)             Jack W. Pirozzolo (BBO # 564879)
jhueston@hueston.com                         jpirozzolo@sidley.com
Marshall Camp (*pro hac vice*)               SIDLEY AUSTIN LLP
mcamp@hueston.com                            60 State Street, 36th Floor
HUESTON HENNIGAN LLP                         Boston, MA 02109
523 W. 6th Street, Suite 400                 (617) 223-0304
Los Angeles, CA 90014
(213) 788-4340
                                             Joan M. Loughnane (*pro hac vice*)
                                             jloughnane@sidley.com
                                             SIDLEY AUSTIN LLP
                                             787 7th Avenue
                                             New York, NY 10019
                                             (212) 839-5567

                                             *Attorneys for Defendant*
                                             *William McGlashan, Jr.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 20, 2019, this document, filed through the CM/ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ Jack W. Pirozzolo*

Jack W. Pirozzolo