**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

UNITED STATES OF AMERICA,

     v.

DAVID SIDOO, et al.,

          Defendants.

Case No. 19-cr-10080-NMG

***Leave to File 35-Page Brief***
***Granted on 3/19/20***

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION TO DISMISS INDICTMENT WITH PREJUDICE OR, IN THE
ALTERNATIVE, FOR SUPPRESSION OF EVIDENCE BASED ON GOVERNMENTAL
<u>MISCONDUCT AND FOR DISCOVERY AND AN EVIDENTIARY HEARING</u>**

**<u>ORAL ARGUMENT REQUESTED</u>**

## TABLE OF CONTENTS

Page

INTRODUCTION ..................................................................................................................1

BACKGROUND ...................................................................................................................2

    I.      THE DENIALS.................................................................................................2

    II.     THE REVELATION ........................................................................................4

    III.    THE EXCUSES ...............................................................................................6

    IV.   THE FRUITS OF THE MISCONDUCT..........................................................8

    V.    THE FURTHER DISCLOSURES..................................................................12

ARGUMENT ......................................................................................................................14

    I.      THIS COURT HAS INHERENT AUTHORITY TO IMPOSE SANCTIONS AND REMEDY GOVERNMENT MISCONDUCT ....................14

    II.     THE GOVERNMENT'S RECENT DISCLOSURES REVEAL SERIOUS MISCONDUCT ............................................................................................14

          A.    The Government's Disclosures Include Credible Contemporaneous Proof That Federal Agents Coerced Singer Into Fabricating Evidence........................................................................................14

          B.    The Government Apparently Failed To Investigate These Serious Allegations ............................................................................17

          C.    The Government Failed To Disclose This Evidence To Defendants ........18

          D.    The Government Failed To Preserve Relevant Evidence On Singer's Phones........................................................................................24

          E.    The Government's Misconduct Is Especially Egregious Given Its Overzealous Tactics Generally Throughout This Case ...........................27

    III.    THE GOVERNMENT'S MISCONDUCT WARRANTS SERIOUS SANCTIONS .................................................................................................31

          A.    The Indictment Should Be Dismissed........................................................31

          B.    At A Minimum, The Court Should Suppress The Consensual Recordings And Order An Evidentiary Hearing To Examine The Misconduct........................................................................................33

CONCLUSION..................................................................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Berger v. United States*,
   295 U.S. 78 (1935)...........................................................................................17

*Brady v. Maryland*,
   373 U.S. 83 (1963)............................................................................................1

*Clutchette v. Rushen*,
   770 F.2d 1469 (9th Cir. 1985) ........................................................................21

*Correale v. United States*,
   479 F.2d 944 (1st Cir. 1973)...........................................................................30

*Elkins v. United States*,
   364 U.S. 206 (1960)........................................................................................34

*Ferrara v. United States*,
   456 F.3d 278 (1st Cir. 2006)...........................................................................30

*Kyles v. Whitley*,
   514 U.S. 419 (1995)..................................................................................17, 31

*LaFrance v. Bohlinger*,
   499 F.2d 29 (1st Cir. 1974).............................................................................34

*Limone v. Condon*,
   372 F.3d 39 (1st Cir. 2004).................................................................15, 18, 33

*Lucien-Calixte v. David*,
   405 F. Supp. 3d 171 (D. Mass. 2019) .............................................................17

*Maness v. Meyers*,
   419 U.S. 449 (1975)........................................................................................21

*Napue v. Illinois*,
   360 U.S. 264 (1959)........................................................................................18

*Roviaro v. United States*,
   353 U.S. 53 (1957)..........................................................................................21

*Skilling v. United States*,
   561 U.S. 358 (2010)........................................................................................19

*Strickler v. Greene,*
  527 U.S. 263 (1999)..................................................................................17

*United States v. Bernal-Obeso,*
  989 F.2d 331 (9th Cir. 1993) ...................................................................26

*United States v. Berroa,*
  856 F.3d 141 (1st Cir. 2017).......................................................................2

*United States v. Casas,*
  425 F.3d 23 (1st Cir. 2005)......................................................................20

*United States v. Diabate,*
  90 F. Supp. 2d 140 (D. Mass. 2000) ......................................................33

*United States v. Gorski,*
  807 F.3d 451 (1st Cir. 2015).....................................................................23

*United States v. Guzman,*
  282 F.3d 56 (1st Cir. 2002)................................................................14, 31

*United States v. Hanna,*
  661 F.3d 271 (6th Cir. 2011) ...................................................................22

*United States v. Horn,*
  29 F.3d 754 (1st Cir. 1994).............................................................14, 33, 34

*United States v. Houlihan,*
  92 F.3d 1271 (1st Cir. 1996).....................................................................24

*United States v. Jones,*
  620 F. Supp. 2d 163 (D. Mass. 2009) .....................................................19

*United States v. Marshank,*
  777 F. Supp. 1507 (N.D. Cal. 1991) .......................................................33

*United States v. Merlino,*
  2000 WL 294880 (D. Mass. Mar. 10, 2000)...........................................35

*United States v. MIT,*
  129 F.3d 681 (1st Cir. 1997)...............................................................22, 23

*United States v. Monteiro,*
  2005 WL 8162990 (D. Mass. Oct. 31, 2005)...........................................14

*United States v. Osorio,*
  929 F.2d 753 (1st Cir. 1991)...............................................................14, 18

*United States v. Pollock*,
    417 F. Supp. 1332 (D. Mass. 1976) ...................................................33

*United States v. Ramos*,
    210 F. Supp. 2d 1 (D. Mass. 2002) ...................................................24

*United States v. Richman*,
    600 F.2d 286 (1st Cir. 1979) ...........................................................33

*United States v. Robinson*,
    121 F.3d 971 (5th Cir. 1997) ...........................................................22

*United States v. Rossetti*,
    768 F.2d 12 (1st Cir. 1985) .............................................................31

*United States v. Staula*,
    80 F.3d 596 (1st Cir. 1996) .............................................................34

*United States v. Therrien*,
    847 F.3d 9 (1st Cir. 2017)...............................................................31

*United States v. W.R. Grace*,
    439 F. Supp. 2d 1125 (D. Mt. 2006) ...............................................22

*United States v. Zangrillo*,
    No. 19-cr-10080, 2020 WL 1027815 (D. Mass. Mar. 3, 2020) ...........30

*Upjohn Co. v. United States*,
    449 U.S. 383 (1981)........................................................................21

*Westinghouse Elec. Corp. v. Rep. of Phil.*,
    951 F.2d 1414 (3d Cir. 1991)..........................................................23

## STATUTES

18 U.S.C.
    § 1512...........................................................................................15
    § 1512(c) ......................................................................................25
    § 1519...................................................................................15, 25

## RULES

Fed. R. Crim. P.
    16(a)(1) ........................................................................................19
    16(d)(1) ........................................................................................23
    16(d)(2)(D)....................................................................................35

Fed. R. Evid. 403 ................................................................................34

**L.R.**
116.1(c)....................................................................................................................19
116.2(b)...........................................................................................................19, 20
116.2(b)(1)......................................................................................................3, 19
116.2(b)(4)............................................................................................................19
116.6......................................................................................................................23
116.6(a).................................................................................................................23
83.2.2....................................................................................................................28
83.6.5(g)...............................................................................................................35

**Mass. R. Prof'l Conduct**
3.3.........................................................................................................................20
3.4(c)....................................................................................................................20
3.8(d)....................................................................................................................19
3.8(f).....................................................................................................................28
4.1.........................................................................................................................20

## REGULATIONS

**28 C.F.R.**
§ 45.11...................................................................................................................18
§ 50.2(b)...............................................................................................................28

## OTHER AUTHORITIES

ABA Standards for Criminal Justice § 26-2.11 ................................................26

*Actress Lori Loughlin Likely to Face 'Higher Sentence' in College Admissions Scandal, US Attorney Says*, WCVB5 (Oct. 8, 2019), https://www.wcvb.com/article/actress-lori-loughlin-likely-to-face-higher-sentence-in-college-admissions-scandal-us-attorney-says/29402556 ...................28

DOJ, *Guidance for Prosecutors Regarding Criminal Discovery*, https://www.justice.gov/archives/dag/memorandum-department-prosecutors.......................24

DOJ, Justice Manual § 1-7.500, .600, .610, .700, https://www.justice.gov/jm/jm-1-7000-media-relations (last updated Apr. 2018) ..........................................28

DOJ, Justice Manual § 9-27.400, *Plea Agreements Generally* https://www.justice.gov/jm/jm-9-27000-principles-federal-prosecution#9-27.400 (last updated Feb. 2018)................................................................28

DOJ, Justice Manual § 9-5.001, *Policy Regarding Disclosure of Exculpatory and Impeachment Information,* https://www.justice.gov/jm/jm-9-5000-issues-related-trials-and-other-court-proceedings#9-5.001 (last updated Jan. 2020).........................24

## INTRODUCTION

From day one, a centerpiece of the Government's case against Defendants has been a series of recordings of Rick Singer talking to his clients between September 2018 and March 2019 about payments they allegedly made to help their children gain admission to various universities.  The Government has trumpeted those recordings in every iteration of the indictment, and has repeatedly cited them in opposing Defendants' motions for various forms of pre-trial relief.

Yet last month, the Government belatedly disclosed Singer's contemporaneous written notes revealing that those recordings were a sham carefully engineered by government agents in an effort to "entrap" Defendants and "nail" them "at all costs."  10/2/18 Singer Note, Ex. A at 1. The notes state that agents browbeat Singer and instructed him to lie in order to elicit misleading evidence that was inconsistent with the actual facts that Singer had explained to agents.  As detailed in the notes, agents directed Singer *not* to mention on the calls that he had previously told the clients their payments would be "donation[s]" that would go "to the [university] program [and] not the coach," *id.*—in other words, that their payments were *not* unlawful bribes.

At least two members of the prosecution team viewed Singer's notes 16 months ago, back in October 2018.  Yet instead of investigating Singer's assertions—or disclosing the information— the prosecution buried this evidence and repeatedly misrepresented to Defendants and the Court that it had fully complied with its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963). Meanwhile, the Government allowed Singer to delete thousands of potentially exculpatory text messages from his cellphone.  And it then mounted an aggressive (and highly successful) pressure campaign against other defendants to secure guilty pleas and lengthy sentences—all while hiding key exculpatory information from defense counsel, the Probation Office, and this Court.

The Government's extraordinary misconduct warrants extraordinary relief.  The facts known so far justify dismissal of the indictment.  At a minimum, the Court should order

suppression of the tainted recordings.  Suppression is essential because the recordings are highly inflammatory, prejudicial, and deliberately misleading—especially in light of Singer's other statements to Defendants and the Government that the payments were *not* bribes.  The Court should also order an evidentiary hearing to uncover the full truth about the recordings and the Government's efforts to fabricate and conceal evidence.  These measures are essential to preserve the integrity of this proceeding and to deter future prosecutorial misconduct.

## BACKGROUND

Last March, the Government charged Defendants with conspiring with Singer to secure the admission of their children to various colleges through bribery, testing fraud, and other means. The initial complaint and superseding indictments highlight Singer's recorded calls to Defendants as the evidentiary centerpiece of the Government's case.  *See, e.g.*, ECF Nos. 3-3 to 3-5 ¶¶ 192-93, 219-20, 285-86, 445-49; ECF No. 732 ¶¶ 122, 132-33, 163-64.

The Government must prove that Defendants knowingly bribed employees of the schools or testing services.  *See United States v. Berroa*, 856 F.3d 141, 154, 157 (1st Cir. 2017). Defendants have thus repeatedly asked the Government to disclose exculpatory evidence, including evidence that Singer told them the payments were *donations* to benefit the schools, rather than *bribes* to benefit corrupt school officials.  In response, the Government has repeatedly denied such evidence existed.  Those denials were false:  We now know the Government was aware of Singer's notes showing he told his clients their payments would be donations—not bribes—and that federal agents pressured him to lie to create false inculpatory evidence on the calls.  And we now know the Government had, and failed to disclose, numerous interview reports that reflect similar exculpatory admissions by Singer about the nature of the donations made by his clients.

## I.  THE DENIALS

On May 30, 2019, the Government told Defendants that it knew of "no information or

materials" constituting "exculpatory evidence" under Local Rule 116.2(b)(1).  5/30/19 Letter, Ex. B at 7.  At the initial status conference, defense counsel challenged the Government's narrow view of its *Brady* obligations—specifically as relating to Singer's representations to clients.  Counsel explained that "[i]f Rick Singer was telling other parents that the money that they were giving to Key Worldwide was going to go to the athletic programs, we think that's exculpatory."  ECF No. 396 at 10.  When the Government disagreed, defense counsel emphasized the "chasm[]" between the parties, noting that "[i]f money went to a school, whatever the discussions, it's not a bribe, at least not a bribe within the ambit of the Government's allegations in this case."  *Id.* at 13.  Magistrate Judge Kelley then "urge[d] the Government" to turn over information if Defendants provided "any arguable reason" why it was exculpatory.  *Id.* at 14.

Over the following months, the Government obtained guilty pleas from multiple defendants.  Meanwhile, the remaining Defendants asked the Government to produce specific categories of evidence bearing on their lack of intent, including evidence that Singer (1) told his clients their payments would fund school-related programs, and (2) did not describe their payments as "bribes" or otherwise use language suggesting impropriety.  9/27/19 Letter, Ex. C at 2.  Defendants also requested all statements the Government made to Singer about what he should say to his clients in consensually recorded conversations, as well as any criticisms or comments the Government made to him about those conversations.  *Id.* at 5.

The Government rejected Defendants' requests as a "fishing expedition" seeking "evidence that is quintessentially *not Brady*."  10/31/19 Letter, Ex. D at 1-2.  The Government later noted, however, that it had "re-reviewed" its FBI 302 Reports and decided to produce written summaries of evidence to individual Defendants—though it still maintained that "[none] of the information . . . constitutes *Brady* material."  11/27/19 O'Connell Letter, Ex. E at 1.  The Government then

provided individual Defendants with cursory "in sum and in substance" summaries of what Singer allegedly said during his FBI interviews, including that he had told certain clients that their "money would be directed to a USC program."  *E.g.*, 11/27/19 Kearney Letter, Ex. F at 1.

Ultimately, the Government's recalcitrance prompted Defendants to file multiple motions to compel between November 2019 and February 2020.  *See* ECF Nos. 648, 693, 699, 703, 865. In response, the Government doubled down and asserted that it "has scrupulously adhered to its discovery obligations in this case, and gone well beyond those requirements."  ECF No. 736 at 1. It also represented that "virtually all the evidence the defendants seek either *does not exist* or *has already been produced*."  *Id.* at 4 (emphasis added).

But then on January 28, 2020—the day Defendants were originally supposed to file their *Brady* replies—the Government suddenly handed over new information.  *See* 1/27/20 Letter, Ex. G (pre-dated).  These disclosures contained statements by multiple FBI interviewees, including statements by Singer that various Defendants thought their payments "went directly to USC's program" and that his clients "typically do not know that [former USC official Donna] Heinel is involved until the time of the[ir] first payment."  *Id.* at 3.  These statements are exculpatory because they help show that Defendants thought their payments were legitimate and went to *USC*—for the school's benefit—not to a corrupt official for her own personal benefit.

The Government offered no explanation for its delay in producing the exculpatory information, though its sur-reply revealed that the information had been in its possession for at least two months.  *See id.*; ECF No 834 at 1.  And the Government once again reiterated that it was "*not* withholding exculpatory evidence."  ECF No. 834 at 2.

## II.   THE REVELATION

On February 19, 2020, while their motions to compel remained pending, Defendants sent the Government a letter about major deficiencies in its production of materials from Singer's cell

phone.  *See* 2/19/20 Letter, Ex. H.  One week later, the Government produced the materials precipitating this motion:  contemporaneous notes that Singer kept on his iPhone describing his interactions with the Government.  *See* 2/26/20 Letter, Ex. I.  The notes memorialize Singer's interactions with agents on October 2, 2018, about recorded calls that they directed him to make to his clients in order to induce inculpatory statements to be used against them in this case.

Singer's notes state that investigators (1) intimidated him into lying on recorded calls with clients to fabricate inculpatory evidence; (2) directed him to omit exculpatory information he had previously told his clients; and (3) wanted to "nail" Defendant Gordon Caplan—who later pleaded guilty and was sentenced to prison—"at all costs."  In Singer's own words:

> Loud and abrasive call with agents.  **They continue to ask me to tell a fib and not restate what I told my clients as to where there money was going -to the program not the coach and that it was a donation and they want it to be a payment.**
>
> I asked for a script if they want me to ask questions and retrieve responses that are not accurate to the way I should be asking the questions.  **Essentially they are asking me to bend the truth** which is what they asked me not to do when working with the agents and Eric Rosen.
>
> **Liz raised her voice to me like she did in the hotel room about agreeing with her that everyone Bribed the schools.  This time about asking each person to agree to a lie I was telling them.**
>
> Spoke to [Parent A] which is a referral from Gordon Caplon [sic].  They want to **nail Gordon at all costs**.  [Parent A] told me his daughter is a good runner 19 minute 3 mile good enough for recruited walk on or walk on to Wash U and Cornell.  Explained the side door but very late and I probably could not do it at this stage.
>
> The agents told me to get him to take another school I had a relationship **just to entrap him** despite him never asking for any other school.
>
> When I told them Gordon texted me that [REDACTED] did not get extended time and the reasons why they still wanted me to ask him for a payment to take the SAT through WHCP even when he was not approved **just to nail him**.  I said that is ludicrous as he will not entertain because she was not approved.

Ex. A at 1 (emphasis added).

Other evidence reveals what prompted the agents' "loud and abrasive" instructions that Singer to "bend the truth" and "not restate" to parents that he had told them the payments would

be donations.  On October 2, Singer had a recorded call with a prospective client to explain the "side door" arrangement.  On that call, Singer repeatedly referred to donations to *coaches*. 10/02/18 Tr., Ex. J at 7-8.  But when the client interrupted Singer and asked him to clarify ("what did you mean by donation to the coach?"), Singer responded that the donation would actually go "to the program."  *Id.* at 12-13 (confirming that the donation would be "specific to the program" and would pay for "training facilities or what have you").  This sort of exculpatory exchange—in which Singer confirmed that the payments were *not* bribes—is exactly what the agents did not want showing up on the recorded calls.  And so they ordered Singer to "bend the truth" to avoid "restat[ing]" his exculpatory characterization of the payments in subsequent calls. Ex. A at 1.

In its February 26 transmittal letter, the Government admitted it had possessed Singer's notes since October 2018 and that prosecutors "saw all or part of" the paragraphs quoted above "on or about October 28, 2018."  Ex. I at 1.  But the Government claimed that at that time it "believed the notes were privileged and did not review them further," and that it "initiated a privilege review process" *a full year later*, in August 2019.  *Id.*  The Government asserted that it was finally producing the notes because "Singer's counsel agreed to waive privilege."  *Id.*  The Government did not deny that the notes accurately describe Singer's interactions with the agents.

Given the gravity of the misconduct reflected in the notes—and the Government's failure to disclose them—Defendants immediately brought these issues to the Court in various filings and at the February 27, 2020 status conference.  *See* ECF Nos. 875, 881, 882, 886; 2/27/20 Conf. Tr., Ex. K at 9.  Defendants also sought clarification from the Government about the substance of the notes and its decision to withhold them.  *See* 2/28/20 Letter, Ex. L; 3/13/20 Letter, Ex. M.

## III.    THE EXCUSES

The Government addressed the notes at the February 27 status conference and in a March 9 letter.  *See* Ex. K at 15-20; 3/9/20 Letter, Ex. N.  Once again, the Government did not deny

Singer's core assertion that federal agents pressured him to lie on the recorded calls and instructed him not to mention the truthful exculpatory statements he had previously made to his clients.

The Government's March 9 letter admits that two prosecutors saw the notes in October 2018.  Ex. N at 2.  It explains that Singer consented to the Government searching the phone with the notes on October 5, 2018, and that Singer's attorney separately agreed "that the [G]overnment could search the . . . phone without a taint protocol" on October 11, 2018.  *Id.* at 1.  Then, around October 28, AUSA Justin O'Connell—who later derided Defendants' *Brady* requests as a "fishing expedition"—reviewed "part of" the October 2 note.  *Id.* at 2.  He emailed an "excerpt[]" of the note to AUSA Eric Rosen and the FBI agents handling the investigation.  *Id.*  The Government's letter claims that Rosen and O'Connell "did not further review" the notes because they believed the notes "were written by Singer at the behest of his attorney and may be privileged."  *Id.* at 2.

The Government's letter also says that on "October 9, 2018," the prosecution team was "assigned . . . a taint AUSA," *id.* at 1, presumably to handle privilege determinations.  But neither Rosen nor O'Connell sent the notes to this taint AUSA in October 2018 or otherwise ensured their review.  *See id.* at 1-2.  Instead, they waited until October 2019 and then sent the notes to Singer's attorney so *he* could review the notes for privilege.  *Id.* at 2.  Singer's attorney did not review those notes—and the Government did not follow up with him—until February 2020.  *Id.*  The Government's taint AUSA only "reviewed the Singer Notes *for the first time*" on February 19, 2020, the same day Defendants sent their letter about Singer's phone.  *Id.* at 2-3 (emphasis added).

Subsequent communications between defense counsel and Singer's counsel indicate that in late February 2020, AUSA Amanda Strachan (a member of the taint team) concluded the notes should be shared with Defendants.  According to Singer's counsel, Strachan told him that "portions of . . . the October 2, 2018 [note], *on its face* appeared to be potential *Brady* or *Giglio* material and

*should be disclosed to the defense.*"  3/11/20 Email, Ex. O at 1 (emphasis added).

## IV.    THE FRUITS OF THE MISCONDUCT

Singer's notes reveal the Government's efforts to fabricate inculpatory evidence against Defendants, including by drafting scripts to guide Singer during calls.  And other evidence in the case shows that Singer followed the Government's directions and further undermines the substance of the recordings.  Consider the following examples:

**John Wilson.**  Before and during his cooperation with the Government, Singer portrayed his methods as legitimate to Wilson and his family.  *See* Wilson Affidavit, Ex. QQ.  On a September 28, 2018 FaceTime videocall with the Wilsons (*see* 10/5/18 iPhone Report, Ex. P)— after Singer's cooperation began—Singer made highly exculpatory statements that continued to reassure Wilson of the propriety of the side-door program.  Singer told them side-door donations, like Wilson's 2014 contribution to USC's water-polo program (and *not* its coach), were a legitimate and prevalent aspect of college admissions that allowed schools to fund their programs. Ex. QQ at 1-2.  He explained that schools can admit applicants with the necessary academic credentials even if they lack the athletic abilities necessary to compete on the schools' varsity teams, and simply require those students to work as assistant managers or in other support roles. *Id.* at 2-3.  The Government made no record of this FaceTime call, even though Singer made the call from an FBI office building during a break in a multi-day interview conducted by half a dozen Boston agents and prosecutors.  *See* 11/24/20 Emails, Ex. RR at 1-2.

Starting September 29, 2018, and continuing for weeks after the Government's "loud and abrasive" instructions to "bend the truth," Ex. A at 1, Singer began interjecting incriminating phrases on calls that the Government *did* record.  An October 15, 2018 call included this exchange:

> SINGER:  So I know when . . . we get the girls in, it's a done deal and you're gonna take care of your part of it, you're gonna make the payments *to the schools* and the -- *to the coaches*.  And that's what I need . . .

8

| | |
|---|---|
| | so I'm not worried about that. |
| WILSON: | Uh, uh, help me understand the logistics?  I thought I make the payment to you and you made the payment *to the school*. |
| SINGER: | Correct.  That's correct. |
| WILSON: | Oh you said that *I* make the payments *to the schools*. |

10/15/18 Wilson Tr., Ex. Q at 9 (emphasis added); *see* 9/29/18 Wilson Tr., Ex. SS at 6-7.  Singer's

references to payments going "to the coaches" are misleading and paint a false picture given his

earlier statements to Wilson that, as before, his payments would go to the university.  That is

precisely what Government agents wanted when they told Singer to "bend the truth" and get "each

person to agree to a lie."  Ex. A at 1.[1]

**Gamal Abdelaziz.**  On October 25, 2018, Singer called Abdelaziz and tried to get him to

agree that "$300,000, um, was paid to . . . Donna Heinel at USC to get [Abdelaziz's daughter] into

school."  10/25/18 Abdelaziz Tr., Ex. R at 4.  But that same week, Singer *told* the Government that

"ABDELAZIZ did not know about HEINEL" and "knew the money was going to the school."

10/31/18 FD-1023, Ex. S at 2.  Indeed, FBI notes describe Singer as saying:  "Donna diverted

some of the money.  *Gamal didn't know about Donna*."  10/31/18 Notes, Ex. UU at 9 (emphasis

added).  Singer's comments on the call were simply a trap to generate fake evidence.[2]

---

[1]  Singer also strategically intermingled comments confirming to Wilson that the funds were intended for school *programs*—not school officials.  On a November 5, 2018 call, Singer explained that "women's lacrosse is always looking for help," and that "[w]omen's fencing, [is] looking for help," and that these programs' need for donations enabled Singer to facilitate admissions.  11/5/18 Wilson Tr., Ex. TT at 7.  At the same time, however—and consistent with the Government's instructions—Singer also interjected seemingly incriminating comments about paying a "coach."  *Id.* at 3 ("I have to pay the coach"); *id.* ("we'll pay the coach"); *id.* at 7 ("we pay the coach, we get it done").  Wilson, who had previously given to a school only for the benefit of a program and not to a coach, remained oblivious to this misdirection, continuing to understand "the coach" as a shorthand for the coach's *program*.  *See id.* at 8 ("Does [the coach] care about budget this year versus next year?"); *cf. id.* at 6 ("And if I pull the trigger, that means I have to commit to him and *pay* (inaudible) *Stanford*?" (emphasis added)).  No doubt the Government will portray its orchestrated recording as evidence of Wilson somehow acknowledging guilt.

[2]  Similar facts and a similar scenario underlie Singer's calls with Diane and Todd Blake.

**Lori Loughlin.**   On November 29, 2018, Singer called Loughlin and similarly used language to make it seem she knew the donations were bribes.  Singer fabricated an IRS audit and stressed that he "ha[d] not told [the IRS] anything about [Loughlin's daughters] going through the side door, through crew, even though they didn't do crew to get into USC . . . all [he] told them was that you guys made a donation to our foundation to help underserved kids."  11/29/18 Loughlin Tr., Ex. T at 2-3.  Loughlin answered "[u]m-hmm"—and that she was "confused."  *Id.*  The Government has repeatedly characterized Loughlin's response as an admission of wrongdoing.  *See, e.g.*, ECF No. 736 at 8.  But in a recorded call that Loughlin made to Singer three months later—after her daughters' high school received a grand jury subpoena for their academic records, and that was not directed by agents seeking to fabricate evidence—Loughlin made clear she did *not* know the payments were bribes or have any idea that Singer had engaged in wrongdoing: "Yeah, no, no, I—I had questions about [U]SC.  I was like, 'Well, maybe the way they got in you're not supposed to get in like that, I don't know, like can you,' but Moss was like, '*No, you can make a donation, it's OK*, like I don't know.'  Uh, yeah I don't know.  But it's all on the up-and-up (inaudible) right?"  3/4/19 Loughlin Tr., Ex. U at 5 (emphasis added).

**Robert Zangrillo.**   In September 2018, Singer told the Government that his insider contact at New York University "did not take any money personally for getting a student into NYU.  Instead, [she] wanted help with fundraisers she had for athletics or help paying bills related to NYU athletics."  9/26/18 FD-1023, Ex. V at 5.[3]  Singer also insisted that his contact "did not get money for helping the ZANGRILLO kid get into NYU."  Ex. V at 5.  But after the Government's "loud and abrasive" directions on October 2, Singer tried to bait Zangrillo into agreeing to the

---

[3]  *See also* 11/29/18 FD-1023, Ex. VV at 3 ("The payments to NYU were not a quid pro quo for getting students into NYU. . . .  The money goes to her program and fundraising.")

exact opposite, telling him:  "I'm just going to say [to the IRS] that . . . [Zangrillo's daughter] didn't get in[to] NYU and no payment was made to my contact at NYU . . . [w]hich we know it was."  10/25/18 Zangrillo Tr., Ex. W at 3.  Singer also said that he would not tell the IRS that they "essentially paid Donna Heinel . . . at USC to help [the daughter] get in."  *Id.*  Both assertions squarely contradict what Singer had told the Government about the payments.

 **Bill McGlashan**.  On October 24, 2018, Singer placed a recorded call to McGlashan in which he tried to get McGlashan to agree to the following:

> [a]As you know, when families pay for . . . either takin' the test or goin' through the side door, all the money goes through my foundation, *and then I pay it out to whoever needs to get paid,* like I did for, you know [McGlashan's son] when he took the [ACT test] . . . So I paid half of it to Mark [Riddell] and half of it to West Hollywood College Prep through my foundation, so that the family essentially has no connection back to what has happened.

10/24/18 McGlashan Tr., Ex. X at 4 (emphasis added).  In fact, McGlashan knew nothing about any diversion of money from Singer's foundation to pay bribes.  As Singer told the Government, he "did not go into detail about the testing" with McGlashan.  11/9/18 FD-1023, Ex. Y at 2.  And as to the side door, which McGlashan decided not to pursue, Singer told him in a recorded call that payments would be made to "[USC] Women's Athletics," not to Singer's foundation, much less to a corrupt university official.  7/30/18 McGlashan Tr., Ex. Z at 9.

 Singer's false statements in the October 24 call were carefully scripted by AUSA Rosen.  In Singer's notes of the "[l]oud and abrasive" discussion with agents three weeks earlier, he wrote that he "asked for *a script* if they want me to ask questions and retrieve responses that are not accurate."  Ex. A at 1 (emphasis added).  Rosen then wrote an e-mail with a "McGlashan script" that Singer followed closely during the October 24 call.  McGlashan Script, Ex. AA.  Singer parroted Rosen's scripted statements about the payments nearly verbatim:

> As you know, when families pay me for either the testing like you did or this side-door, it goes into my Foundation, and then I pay out to whoever needs to be paid

**like I did with you, right? – I wrote checks to Mark and Igor** after the exam, that way there is no connection between you and them, RIGHT????

*Id.* This false suggestion—that McGlashan knew things that Singer had carefully hidden from him—plainly sought to manufacture evidence of knowledge where none existed.

## V.    THE FURTHER DISCLOSURES

In the wake of the disclosure of Singer's notes, the Government has indicated it will produce some of the exculpatory materials requested by Defendants. *See* ECF No. 918.  The extent of the Government's newfound willingness to abide by *Brady* remains to be seen.  But the additional disclosures reviewed so far only broaden the scope of the Government's misconduct.

For one, recently produced witness reports confirm that Singer repeatedly told the Government that he misled his clients about his scheme—and that the Government has improperly been withholding this information all this time.  Consider the following representative examples of clearly exculpatory information the Government withheld for almost a year after it was obligated to produce all *Brady* material:  On September 21, 2018, Singer told the Government that "[i]nitially all the payments to USC went to the programs."  9/21/18 FD-1023, Ex. BB at 3.  A week later, he told the Government that specific parents "think they are going through [Singer's] relationships but . . . do not know exactly where the money is going."  9/27/18 FD-1023, Ex. CC at 3.  On October 31, 2018, Singer told the Government another parent "did not know the money was going to [Georgetown's coach]; he believed it was going to the Georgetown tennis program," Ex. S at 2, and that a parent "did not review . . . [Singer's fake] athletic profile"—Singer "just sent it to USC.," *id.* at 3.  On November 1, 2018, Singer told the Government another "family thought they were making a donation to the Georgetown tennis program."  11/1/18 FD-1023, Ex. DD at 4, and that he told another client "that the money was going to USC," *id.* at 5.  And when the Government finally asked—in *December 2019*—about what Singer told Defendants Giannulli and Loughlin,

Singer said that they "thought their payment of $50,000 went directly to USC's program" and that "their $200,000 payment went to [Singer's] [f]oundation."  12/6/19 FD-1023, Ex. EE at 2.

The recent disclosures also show that the Government knowingly allowed Singer to destroy potentially exculpatory evidence.  For over a year, the Government knew Singer was actively deleting relevant iMessages throughout his cooperation—but it failed to stop him, recover the messages, or secure the phones.  *See* 3/13/20 Letter, Ex. GG at 3-4; Gardner Decl., Ex. PP at 3. 3/11/19 Excerpt, Ex. FF; Ex. H at 2-3.  And although Singer used at least four phones while working as an informant, the Government recorded calls on only *one* of them—even though it knew Singer was using the others to call alleged co-conspirators.  *See* 10/23/18 FD-1023, Ex. HH; Ex. GG at 3-4.

The disclosures also reveal the lengths to which the Government went to micromanage the substance of Singer's recorded consensual calls to generate incriminating evidence—and to hide those efforts from Defendants.  As discussed, AUSA Rosen literally drafted a "script" for Singer to use to entrap Defendant McGlashan.  *Supra* at 11-12.  And the Government recently produced an inadvertently recorded conversation among Singer, his attorney, Rosen, and other members of the prosecution team on October 1, 2018, in which Rosen provided detailed instructions for what Singer should say—and *not* say—on future recorded calls with Heinel.  *See* 10/1/18 Call Tr., Ex. II.  Among other things, Rosen instructed Singer to "tone . . . down" mention of admission candidates' athletic abilities on recorded calls because "all of these people aren't getting recruited by USC" and "*that's the message that we sort of want to get across*."  *Id.* at 2 (emphasis added). In other words—just as with the events recounted in the October 2 note—the Government was coaching Singer to avoid mention of accurate but exculpatory material that would muddy the black-and-white picture of wrongdoing it sought to create through Singer's calls.

The October 1 recording also shows the Government's efforts to shield its fabrication of evidence from Defendants. Mid-way through the call, AUSA Rosen realized that Singer used his personal phone (which was being recorded by the investigators and would thus be discoverable) instead of his government-supplied "burner" phone (which was not being recorded). *Id.* at 3. Clearly flustered, Rosen insisted that Singer immediately end the call and re-join on an unmonitored line: "Rick, you hang up *right now*." *Id.* at 3 (emphasis added).

## ARGUMENT

### I.   THIS COURT HAS INHERENT AUTHORITY TO IMPOSE SANCTIONS AND REMEDY GOVERNMENT MISCONDUCT

Federal courts possess inherent supervisory authority to formulate remedies to address the "violation of a recognized right, preserve judicial integrity, and deter illegal conduct." *United States v. Osorio*, 929 F.2d 753, 763 (1st Cir. 1991). The First Circuit has made clear that it will "consider unleashing the supervisory power in criminal cases '[w]hen confronted with extreme misconduct and prejudice,' in order 'to secure enforcement of "better prosecutorial practice and reprimand of those who fail to observe it."'" *United States v. Horn*, 29 F.3d 754, 760 (1st Cir. 1994). These powers include broad discretion to impose sanctions and formulate remedies, including "suppression of tainted documents." *Id.* at 766; *see also United States v. Monteiro*, 2005 WL 8162990, at *5 (D. Mass. Oct. 31, 2005) (ordering disclosure of "all [relevant] materials"). And in "rare and extreme circumstances," the court may "dismiss criminal charges as a sanction for government misconduct." *United States v. Guzman*, 282 F.3d 56, 59 (1st Cir. 2002).

### II.   THE GOVERNMENT'S RECENT DISCLOSURES REVEAL SERIOUS MISCONDUCT

#### A.   The Government's Disclosures Include Credible Contemporaneous Proof That Federal Agents Coerced Singer Into Fabricating Evidence

"[I]f any concept is fundamental to our American system of justice, it is that those charged

with upholding the law are prohibited from deliberately fabricating evidence and framing individuals for crimes they did not commit." *Limone v. Condon*, 372 F.3d 39, 44-45 (1st Cir. 2004). Such conduct violates due process and obscures the truth. *See, e.g.*, *id.*; *cf.* 18 U.S.C. §§ 1512, 1519. For government agents to coerce an informant into lying on recorded calls to generate *false* inculpatory evidence against investigative targets—and to then knowingly prosecute those targets using that false evidence—is governmental malfeasance of the worst kind.

Here, Singer's contemporaneous memorialization of his meetings and discussions with agents demonstrate precisely such misconduct. In the October 2 note, Singer describes how agents (1) yelled at him, (2) told him to lie on recorded calls when describing his interactions with clients to secure seemingly incriminating statements from the clients, (3) told him to *not* mention on the recorded calls the exculpatory information he had previously told his clients, and (4) wanted to entrap a parent (and presumably the other Defendants subject to the calls) at all costs. *See* Ex. A at 1.

Moreover, the allegations in the note are credible. Singer wrote the note within two days of the interactions it memorializes, when those events were still fresh. *See* 10/2/18 Singer Note, Ex. JJ ("Created: 10/1/2018 12:27(UTC-4)" "Modified: 10/4/2018 22:29(UTC-4)"). And the note is corroborated by Singer's conversation that same day with the prospective client in which Singer triggered the agents' displeasure by confirming to the client that the payments would go to the "program" for legitimate purposes, and not to any "coach" for personal use. Ex. J at 7-8, 12. Also, Singer began cooperating on or shortly after "September 21, 2018," Ex. N at 1, so the October 2 note was written quite early during his cooperation—when his incentive to cooperate with the Government and curry favor was at its peak. Singer had no reason to fabricate allegations of misconduct against government agents. Nor is there any indication from the note that Singer

drafted the note for anyone other than himself.  Indeed, Singer's iPhone revealed that he often made notes as reminders and for his own reference.  Moreover, the fact that Singer told his clients the payments were donations and not bribes is corroborated by numerous admissions Singer made in witness interviews that the Government has had in its possession since Singer began cooperating but failed to turn over until just this month, in violation of *Brady*.

Singer's note reveals extraordinary government misconduct.  Singer does not merely allege that agents directed him to lie to obtain inculpatory statements from targets (though that would be bad enough).  Rather, his October 2 note describes an orchestrated frame-up.  Even though Singer told the Government that he had told his clients their money was going to universities as donations—and not to individual officials—the agents instructed Singer to call his clients and lie about the payments and describe them as bribes.  *See* Ex. A at 1 (describing instruction to "ask[] each person to agree to a lie [Singer] was telling them").  The agents sought to orchestrate recorded conversations in which Singer would trick his clients into *falsely* agreeing (or not overtly challenging) that any payments made were bribes.  And the agents' insistence that Singer *omit* the accurate description of what he had previously told his clients about the payments shows that *the agents* recognized that those prior explanations of the payments were exculpatory.

Government investigators sometimes have cooperating witnesses tell lies to obtain inculpatory statements from criminal defendants.  That tactic is permissible.  But here, the inculpatory statement *is* the lie.  The agents did not direct Singer to have his clients incriminate themselves by acknowledging *truthful* historical facts—they had Singer lie or misleadingly characterize historical facts to make the conversation appear inculpatory.  That is not investigating evidence; it is fabricating evidence.

The consensual recordings are perhaps the Government's most important evidence.  The

allegation that the parents understood their payments were illegitimate bribes and not legitimate donations has been central to the Government's case from the beginning.[4]  The Government's tactics were designed to support that allegation, and to prevent Defendants from discovering that the recordings were fabricated at the Government's direction.

"[A]ny reasonable officer would . . . recognize[] that falsifying witness statements and excluding potentially exculpatory evidence to establish probable cause violates an individual's constitutional right to be free from unreasonable arrest and prosecution." *Lucien-Calixte v. David*, 405 F. Supp. 3d 171, 178 (D. Mass. 2019) (Gorton, J.).  Yet the October 2 note indicates that agents fabricated inculpatory evidence—and intentionally excluded exculpatory evidence—to bolster the chances of a conviction.  And although the Government has had ample opportunity to deny Singer's account of the agents' unlawful conduct, it has not done so.

### B.   The Government Apparently Failed To Investigate These Serious Allegations

Upon learning of Singer's October 2 note, Defendants immediately asked the Government what—if anything—it had done to investigate the alleged misconduct.  *See* Ex. L.  The Government refused to respond.  Its apparent decision to turn a blind eye to what happened is deeply troubling.  The prosecutor has a "special role . . . in the search for truth in criminal trials." *Strickler v. Greene*, 527 U.S. 263, 281 (1999).  His interest "is not that [he] shall win a case, but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935).  Prosecutors thus have an affirmative obligation to seek the truth, and to avoid relying on evidence that they have reason to believe was tainted or fabricated. *See, e.g.*, *Kyles v. Whitley*, 514 U.S. 419, 437 (1995) ("[T]he

---

[4]  *See, e.g.*, ECF Nos. 3-3 to 3-5 ¶¶ 192-93 (quoting consensual recording where Singer *tells* Defendant Abdelaziz the payments went to Heinel); *id.* ¶¶ 219-20 (similar for Defendants Giannulli and Loughlin); *id.* ¶¶ 285-86 (similar for Defendant Zangrillo); *id.* ¶¶ 376-77 (similar for Defendant Elisabeth Kimmel); *id.* ¶¶ 445-49 (similar for Defendants Diane and Todd Blake); *id.* ¶ 151 (similar for Defendant McGlashan); ECF No. 732 ¶¶ 122, 132-33, 163-64.

individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case."); *Osorio*, 929 F.2d at 761 ("The prosecutor charged with discovery obligations cannot avoid finding out what 'the government' knows, simply by declining to make reasonable inquiry of those in a position to have relevant knowledge.").

Once AUSAs Rosen and O'Connell reviewed the October 2 note, both knew of credible allegations of serious misconduct by government agents. Yet neither Rosen nor O'Connell—nor anyone else on the prosecution team—appears to have taken any steps to investigate Singer's allegations. It even appears Rosen and O'Connell circumvented the established process when they decided to do *nothing* further with the notes based on a purported privilege. Although a taint AUSA had been assigned to the case earlier that month, Rosen and O'Connell did not involve the taint AUSA when they decided to ignore Singer's notes. Ex. N at 2. And the Government admits it did *nothing* with the notes for 10 months, and then it was O'Connell—not the taint AUSA or team—who dictated the next steps on the privilege analysis. *Id.*

The Government has an affirmative duty to ensure that the evidence it relies on is accurate. *See, e.g.*, *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Limone*, 372 F.3d at 45-46. Here, that means the prosecutors should have investigated Singer's allegations—immediately after learning about them—to ensure the evidence generated by his calls was accurate and untainted by coercion. *Cf.* 28 C.F.R. § 45.11. More generally, they should have investigated and ensured that *all* the evidence generated by Singer under direction of the agents was trustworthy and accurate. To the extent the prosecutors conducted no investigation after reviewing the note—and as best we know, they did not—that failure disregards Defendants' constitutional rights and violates their duty to do justice.

### C.    The Government Failed To Disclose This Evidence To Defendants

The Government's failure to produce the notes or the information within them until now is just as problematic. Because of the Government's "enduring difficulty in discharging its duty to

disclose material exculpatory information to defendants in a timely manner," this Court has promulgated Local Rules to serve as a "road map" for complying with *Brady*. *United States v. Jones*, 620 F. Supp. 2d 163, 168-70 (D. Mass. 2009). Local Rule 116.2(b) requires the Government to disclose to Defendants any "information that would tend directly to negate the defendant's guilt concerning any count in the indictment or information" and any "information that would cast doubt on the admissibility of" certain Government evidence. *See also* Mass R. Prof'l Conduct 3.8(d) (similar). And Local Rule 116.1(c) requires that the Government also provide all information specified in Federal Rule of Criminal Procedure 16(a)(1), which includes "papers, documents, data, photographs, [or] tangible objects" if the item is in the government's control and is "material to preparing the defense." Here, the Government was required to disclose these categories of information by May 30, 2019. *See* L.R. 116.2(b)(1); ECF No. 373 at 23:25-24:1.[5]

Singer's notes, and the underlying facts those notes reveal, are plainly exculpatory and should have been disclosed by that date. To prevail at trial, the Government must prove that Defendants knowingly bribed the schools. *See Skilling v. United States*, 561 U.S. 358, 412-13 (2010). The notes confirm that Singer told his clients "the[ir] money was going []to the program not the coach and that it was a donation." Ex. A at 1. The fact that Singer described the payments as *donations* that would benefit the schools—and not *bribes* that would benefit corrupt officials— is material, relevant, and exculpatory. It undermines the notion that Defendants intended to commit fraud . The information thus tends to directly negate Defendants' "guilt concerning a[] count in the indictment." L.R. 116.2(b). And because the notes indicate that the Government coerced Singer into fabricating evidence, they also "cast doubt on the admissibility" of the

---

[5] For defendants who plead guilty, L.R. 116.2(b)(4) also requires the Government to disclose a summary of any information that "tends to diminish the degree of [their] culpability."

Government's consensual records.  *Id.*

There is no doubt that the notes should have been turned over by May 30, 2019.  Indeed, the Government's taint AUSA Strachan, to her credit, had little difficulty concluding that the October 2 note "*on its face* appear[s] to be potential *Brady* or *Giglio* material and should be disclosed to the defense" as soon as she reviewed the note.  Ex. O at 1 (emphasis added).[6]  That concession completely undermines the Government's longstanding position that evidence about what Singer told his clients about their payments is not *Brady* material.  *See, e.g.*, ECF No. 693 at 3-4; *supra* at 3-4.  Similarly, at the February 27 status conference, AUSA Rosen appeared to concede that the October 2 note is exculpatory and should have been disclosed earlier.  *See* Ex. K at 19:20 ("MR. ROSEN:  What I'm saying is that as soon as we completed the tape [sic] review, we turned it over.  Should we have done that earlier?  *Absolutely*." (emphasis added)).

The Government's conduct is particularly troubling because Defendants could not learn this information on their own.  Singer, as a cooperating witness, has been under government control and is thus unavailable to Defendants.  And the Government's serial misrepresentations about the completeness of its disclosures—to the Defendants, this Court, and in other related proceedings—further exacerbate its misconduct.  "Prosecutors," as all attorneys, "have a duty of candor to the court."  *United States v. Casas*, 425 F.3d 23, 40 (1st Cir. 2005); *see also* Mass R. Prof'l Conduct 3.3, 3.4(c), 4.1.  Here, at least two prosecutors—AUSAs Rosen and O'Connell—were aware of the note's exculpatory contents and knew it was being withheld.  Yet they repeatedly told

---

[6]  Singer's notes also include an October 5, 2018 note stating that Defendant McGlashan is "no longer" pursuing the side door.  Ex. A at 2-3.  Considering the Government charged McGlashan with conspiracy to engage in the alleged side-door scheme, this statement by the Government's main cooperating witness is plainly exculpatory.  Similarly, Singer's January 30 note about Defendant Wilson says "donation to USC program for real polo player," 1/30/19 Note, Ex. WW—exculpatory information the Government did not disclose and that it repeatedly misrepresented in public statements.

Defendants and the Court that they "ha[d] not withheld any such evidence based on [their] disagreement about the merits of the defendants' requests," that "the [G]overnment is not withholding any exculpatory evidence," and that they had "scrupulously adhered to [their] discovery obligations." ECF No. 736 at 2, 3, ECF No. 834 at 2.[7]  At no point did the prosecutors reveal or even suggest that they were withholding exculpatory evidence based on a third party's privilege.  The prosecutors violated their duty of candor.

The Government has tried to justify its belated disclosure because AUSAs Rosen and O'Connell allegedly believed Singer's notes were privileged.  That excuse is a total red herring: The Government had an obligation to relay the *substance* of these conversations it had with Singer *independent* of the fact that he memorialized those conversations in written notes.  The Supreme Court has made clear that the attorney-client privilege "extends only to communications and not to facts."  *Upjohn Co. v. United States*, 449 U.S. 383, 395-96 (1981).  At a very minimum, the Government had an obligation to disclose the *facts*—and it failed to do so.

Nor would attorney-client privilege shield even the *notes* from disclosure.  "Standing alone, the attorney-client privilege is merely a rule of evidence; it has not yet been held a constitutional right."  *Clutchette v. Rushen*, 770 F.2d 1469, 1471 (9th Cir. 1985) (citing *Maness v. Meyers*, 419 U.S. 449, 466 n.15 (1975)).  A criminal defendant's right to material exculpatory evidence, however, *is* rooted in the Constitution.  For that reason, as the Supreme Court has held in the context of the Government's informant's privilege, "[w]here the disclosure . . . is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, *the privilege must give way*."  *Roviaro v. United States*, 353 U.S. 53, 60-61 (1957) (emphasis added); *see also,*

---

[7]  *See also* 11/17/19 Letter, Ex. KK at 1 ("The government is familiar with its *Brady* obligations, and has complied with them, and will continue to do so as this case progresses."); Ex. D at 1 (same); Ex. F at 2 (same); 11/27/19 Letter to S. Berkowitz, Ex. LL at 2 (same).

*e.g.*, *United States v. Hanna*, 661 F.3d 271, 295 (6th Cir. 2011); *United States v. W.R. Grace*, 439 F. Supp. 2d 1125, 1142-47 (D. Mt. 2006).  AUSA Strachan was therefore absolutely correct:  The notes are clear-cut *Brady* material and "should be disclosed to the defense," Ex. O at 1—*regardless* of any privilege assertion.

In any event, it is hard to believe the Government actually thought the notes were privileged.  The Government obtained consent to search Singer's phone *both* from Singer *and* his attorney in October 2018.  Ex. N 1.  The Government never flagged the October 2 note to the taint team presumably responsible for conducting the privilege review.  *Id.* at 2  The Government took a year to even ask Singer's attorney whether he was asserting privilege.  *Id.*  And then it failed to follow up with Singer's attorney and get a response to that question until *last month*, when Defendants sent their discovery letter about Singer's iPhone.  *See id.* at 3; Ex. O.

Moreover, the notes are clearly *not* privileged.  The attorney-client privilege applies when "(1) . . . legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, [and] (3) the communications relat[e] to that purpose."  *United States v. MIT*, 129 F.3d 681, 684 (1st Cir. 1997).  Nowhere do the notes suggest they relate to Singer seeking legal advice from counsel.  To be sure, the Government and Singer's counsel have now asserted that Singer later "sent these notes to his lawyer," but that does not make them privileged.  "It goes without saying that documents do not become cloaked with the lawyer-client privilege merely by the fact of their being passed from client to lawyer."  *United States v. Robinson*, 121 F.3d 971, 975 (5th Cir. 1997).

The attorney-client privilege also requires "[a]n intent to maintain confidentiality."  *MIT*, 129 F.3d at 684.  That is lacking here too.  Singer wrote the notes on the phone that he allowed the Government to monitor.  Moreover, *both Singer and his attorney provided their unqualified consent for the Government to search the phone*.  Ex. N at 1.  Singer even allowed the Government

to extract the phone's full contents on at least *nine* occasions, and he provided his unqualified consent to a "complete search" every time. *See* Consent Forms, Ex. MM.  The notes were not kept confidential.[8]

The Government has asserted that despite all this, it "did not treat" Singer's consent "as a waiver of Singer's attorney-client privilege." Ex. N at 1.  But that makes no difference.  "[U]nder traditional waiver doctrine a voluntary disclosure to a third party waives the attorney-client privilege even if the third party agrees not to disclose the communications to anyone else." *Westinghouse Elec. Corp. v. Rep. of Phil.*, 951 F.2d 1414, 1427 (3d Cir. 1991); *see also MIT*, 129 F.3d at 687.  The Government cannot unilaterally assert privilege on behalf of a cooperating witness in order to avoid turning over exculpatory evidence to the defense.

Finally, this Court's Local Rules and the Federal Rules of Criminal Procedure confirm that the Government's secret and unilateral decision to withhold exculpatory evidence in this case was improper.  Local Rule 116.6 establishes this Court's procedural mechanism for withholding *Brady* material for any reason.  If a party determines that "it would be detrimental to the interests of justice" to make a required disclosure, "such disclosures may be declined" by advising the other side "in writing, with a copy filed with the clerk, of the specific matters on which disclosure is declined and the reasons for declining." L.R. 116.6(a).  This mechanism allows the opposing party "to challenge the declination" with the court if it thinks it is appropriate. *Id.*; *see also* Fed. R. Crim. P. 16(d)(1) (providing similar mechanism).[9]  The Government has invoked Local Rule 116.6's

---

[8]  Even if the notes were privileged, they would likely be subject to disclosure under the crime-fraud exception because—if Singer did send the notes to his attorney for the purpose of obtaining "advice"—Singer would have been seeking advice about fabricating evidence in violation of the obstruction-of-justice statutes. *See United States v. Gorski*, 807 F.3d 451, 460 (1st Cir. 2015) (explaining elements of crime-fraud exception).

[9]  DOJ policies adopt the same approach.  Prosecutors should "seek a protective order from the court addressing the scope, timing, and form of disclosures" in circumstances "[w]hen the

mechanism in the past.  *See United States v. Ramos*, 210 F. Supp. 2d 1, 2 (D. Mass. 2002) (noting Government's use of this mechanism).  Inexplicably, however, it failed to do so here.  Instead, the Government chose to withhold the evidence on its own say-so.

To sum up:  Everyone now agrees that Singer's notes—and the facts those notes reveal— are exculpatory.  Yet the Government hid them for 16 months based on a unilateral (and frivolous) assertion of privilege on behalf of a cooperating witness who had repeatedly *consented* to sharing the evidence with the Government.  All the while, the Government misled *these* Defendants and the Court about its compliance with *Brady* and pressured *other* defendants to plead guilty.  This is not how the criminal justice system—or our Government—is supposed to work.

### D.     The Government Failed To Preserve Relevant Evidence On Singer's Phones

The Government also recently revealed additional troubling details about its supervision of Singer.  As noted above, it is now apparent that the Government failed to preserve patently relevant evidence from Singer's phones, failed to secure those phones, repeatedly let Singer delete relevant and potentially exculpatory information from his iPhone—and took no efforts to retrieve this information until Defendants inquired about the missing materials.  *See supra* at 5-6, 13.

"By adopting a 'what we don't create can't come back to haunt us' approach, prosecutors demean their primary mission: to see that justice is done."  *United States v. Houlihan*, 92 F.3d 1271, 1289 (1st Cir. 1996).  The prosecution adopted that approach here.  The Government chose to record only the calls that Singer made on his iPhone 7+.  It did so pursuant to a Title III wiretap between June 5, 2018, and September 29, 2018, and with his consent between September 27, 2018

---

disclosure obligations are not clear" or the need to "protect[] privileged information" "conflict[s] with the discovery obligations."  DOJ, *Guidance for Prosecutors Regarding Criminal Discovery*, https://www.justice.gov/archives/dag/memorandum-department-prosecutors; *see also*  DOJ, Justice Manual § 9-5.001, *Policy Regarding Disclosure of Exculpatory and Impeachment Information,*     https://www.justice.gov/jm/jm-9-5000-issues-related-trials-and-other-court-proceedings#9-5.001 (last updated Jan. 2020) (similar).

and March 11, 2019.  Ex. GG at 3.  But recently produced extraction reports of Singer's iPhone 7+ show that the Government failed to prevent Singer from deleting hundreds of iMessages, including iMessages to clients and alleged co-conspirators, while he was cooperating with the Government.[10]  *See* Ex. FF; Ex. H at 2-3.  Materials produced by the Government on March 6, 2020, confirm that all but 18 of Singer's iMessages before September 27, 2018 (six days after he was approached by the Government) were deleted.  *See* Ex. PP at 1-2.  Singer deleted at least **2,244** iMessages from before September 27, 2018—and that likely understates the real number of deleted iMessages because of limitations in identifying deleted data.  *Id.* at 2-3.[11]

Given this timing, it seems almost certain that Singer deleted all of his iMessages because he learned about the Government's investigation.  This would be a serious act of obstruction of justice, *see* 18 U.S.C. §§ 1512(c), 1519, and would be readily apparent to any investigator or prosecutor reviewing the extraction reports.  Yet by all accounts the Government has not charged Singer with obstruction based on his deletion of these messages.

Singer's destruction of evidence was not limited to his initial iMessage wipe either.  He *continued* to delete iMessages throughout his time as a Government agent.  Between September 27, 2018, and March 10, 2019, Singer deleted at least 559 iMessages.  Ex. PP at 2.  During that time, the Government seized Singer's iPhone and extracted its contents nine times.  Ex. GG at 3.  Even a cursory review of those extractions would have shown that Singer was deleting his iMessages.  But as best we can tell, the Government neither told Singer to stop destroying evidence nor tried to recover the iMessages—as it likely could have at that time.  *See* Ex. PP at 2.  Indeed,

---

[10]  iMessages are end-to-end encrypted text messages between iPhone users that cannot be intercepted by wiretap, but can be extracted from the phone using forensic hardware and software.

[11]  This tally is based on the incomplete information Defendants currently have.  The Government did not produce the full extraction *reports* until March 6, 2020, and it has yet to produce some of the full extractions themselves.

it seems the Government made no efforts to recover Singer's iMessages until this month. *See* Ex. GG at 3. And rather than retain Singer's iPhone 7+ at the end of his informant work, the Government let him keep the device—which he then traded in for a newer model in May 2019, meaning the 7+ is now lost. *Id.* Combined with the passage of time, the loss of the physical device all but ensures that most (if not all) the deleted iMessages are irrecoverable.

The Government has never explained why it allowed Singer to destroy thousands of iMessages and did nothing to try to recover them. It is possible (though highly unlikely) that the Government's failure to preserve this key evidence was merely an oversight. But it is also possible that the Government knew Singer spoke to alleged co-conspirators by iMessage—and that Singer was deleting those iMessages—but simply did not care. After all, the Government had no need for Singer's iMessages as a source of evidence because it was fabricating its own evidence using scripted calls. And allowing Singer to communicate with alleged co-conspirators by unmonitored iMessage facilitated his ability to shape their responses on recorded calls.

The ABA's Standards for Criminal Justice warn precisely about this sort of conduct:

> *A faithless cooperator may attempt to inculpate another through selective recording of conversations* or attempt to falsely exonerate an ally by tipping him or her off before the taping. *Either of these tactics can then be amplified if the cooperator later dishonestly interprets a cryptic or ambiguous conversation for investigators.*

ABA Standards for Criminal Justice § 26-2.11; *see generally United States v. Bernal-Obeso*, 989 F.2d 331, 333 (9th Cir. 1993) (noting that "criminal informants are cut from untrustworthy cloth" and must be "carefully watched by the government" to prevent them from "manufacturing evidence against those under suspicion of crime"). The Government's failure to monitor Singer's communications further undermines the reliability of his recorded conversations.

Other examples of the Government's reckless disregard for Singer's unmonitored communications abound. On October 23, 2018, the Government learned that Singer had purchased

an unauthorized "burner" phone and told six families about the investigation because he "had loyalty to all of them." Ex. HH at 1-2. Singer specifically warned them that he would "eventually . . . call them and ask questions [*i.e.*, on a recorded call]." *Id.* at 1. But the Government waited *eight* days upon learning about the unauthorized phone (and the obstruction) to seize this phone, Ex. GG at 4, thereby giving Singer plenty of time to delete information from this phone as well. The Government let Singer use yet *another* phone in October 2018, an iPhone 8+, which was not monitored and to be used for calls with agents and his attorney. *Id.* But other than installing a pen register—which logs the numbers for incoming/outgoing calls and ordinary texts but does not capture iMessages or FaceTime Calls—the Government apparently took no measures to ensure this phone was not used improperly and that relevant evidence was not destroyed either. Nor did the Government seize this phone when Singer's informant role was over; it remains in his possession, *see id.* at 3-4, meaning any relevant evidence is almost certainly lost.

We do not know why the Government allowed Singer to avoid monitoring and detection on his various devices—or why it appears to have made no serious effort to recover information that was deleted when it had the opportunity to do so. But we do know that these failings are almost certainly prejudicial: It is now impossible for Defendants, the Court, and the jury to ascertain the full context in which Singer's recorded conversations with his clients took place.

### E.   The Government's Misconduct Is Especially Egregious Given Its Overzealous Tactics Generally Throughout This Case

Fabricating evidence, failing to investigate allegations of fabricated evidence, withholding exculpatory evidence, looking the other way when Singer spoliated evidence, and deceiving Defendants and the Court are bad enough. But here, this misconduct is all the worse in light of the Government's other overzealous and improper tactics throughout this case.

*First*, while withholding the notes and many other examples of material exculpatory

information, the Government attempted to coerce defendants into pleading guilty by threatening that if they did not, they would face additional charges—even though the factual basis for the charges has remained the same since the outset of this case. When the Defendants now bringing this motion failed to cave, the Government followed through on its threats.[12] The Government had the opportunity to address these curious charging decisions when Judge Woodlock asked about them at Bizzack's sentencing hearing, but it offered no meaningful explanation. *See* ECF No. 34 at 42-45, *United States v. Bizzack*, No. 19-cr-10222 (Oct. 30, 2019) (refusing to answer and resting on prosecutorial discretion). These charging decisions further demonstrate that this case is being handled improperly. After all, DOJ's policies explain that "[c]harges should not be filed simply to exert leverage to induce a plea." Justice Manual § 9-27.400, *Plea Agreements Generally* https://www.justice.gov/jm/jm-9-27000-principles-federal-prosecution#9-27.400. In addition, U.S. Attorney Andrew Lelling has personally flouted this Court's Rules, the Rules of Professional Responsibility, and DOJ regulations and policies by going on television to threaten defendants who refused to plead with "a substantial[]" sentence.[13]

  *Second*, the Government leveraged the apparently tainted consensual recordings to rapidly extract pleas from numerous other defendants, using take-it-or-leave-it offers. *See, e.g.*, ECF No.

---

[12] *See* ECF No. 314 (adding money-laundering conspiracy charges); ECF No. 610 (adding federal-programs-bribery conspiracy and various aiding-and-abetting charges); ECF No. 732 (adding tax charges); *see also* ECF No. 272, *United States v. Ernst*, 19-cr-10081 (adding 22 additional counts against non-pleading defendants).

[13] *See Actress Lori Loughlin Likely to Face 'Higher Sentence' in College Admissions Scandal, US Attorney Says*, WCVB5 (Oct. 8, 2019), https://www.wcvb.com/article/actress-lori-loughlin-likely-to-face-higher-sentence-in-college-admissions-scandal-us-attorney-says/29402556; L.R. 83.2.2 (prohibiting prosecutors from making "extrajudicial statements" that interfere with a defendant's right to a "fair trial" and the "due administration of justice"); Mass. R. Prof'l Conduct 3.8(f) (similar); 28 C.F.R. § 50.2(b) (DOJ's statement of policy articulating same principles); DOJ, Justice Manual § 1-7.500, .600, .610, .700, https://www.justice.gov/jm/jm-1-7000-media-relations (last updated Apr. 2018) (similar).

25 at 4, *Bizzack*, No. 19-cr-10222; ECF No. 34 at 72, *Bizzack*, 19-cr-10222.  It is now clear the Government made these offers and extracted pleas (and substantial sentences) while knowingly withholding *Brady* material from defense counsel and the Court, and made material misrepresentations in the process.  The Government thus relied on tainted evidence to put the screws to defendants while simultaneously withholding information that undermined the evidence's reliability.

Consider Gordon Caplan, who pled guilty and was sentenced last year.  The October 2 note indicates that the recordings the Government relied on at Caplan's sentencing contained fabricated inculpatory evidence and that agents wanted to "nail" him "at all costs."  Ex. A at 1.  Yet the Government did not produce the notes to Caplan before securing his guilty plea.

Similarly, the Government obtained a plea from Jeffrey Bizzack without ever disclosing Singer's notes or interview reports.  At Bizzack's sentencing, Judge Woodlock questioned the Government—extensively—about what evidence showed that Bizzack thought the payments were "going to Ms. Heinel as a faithless employee as opposed to [USC] itself."  ECF No. 34 at 24, *Bizzack*, 19-cr-10222.  And the prosecutor repeatedly argued that Bizzack knew the payments were going to Heinel "for her own personal use."  *Id.* at 22, 25.  Yet a recently produced interview report (summarizing an interview with Singer that the same prosecutor attended) says that "JEFF BIZZAK [sic] believed the money paid was going to the program or to USC."  12/12/18 FD-1023, Ex. NN at 1; *see also* ECF No. 25 at 11, *Bizzack*, 19-cr-10222 (Government repeatedly stating that Bizzack "made payments that he knew would be used to pay bribes").

In the wake of the Government's disclosure of the October 2 note, the defendants who pled guilty and were sentenced without being informed of the improperly withheld exculpatory evidence have written to the Government and Court to challenge the Government's misconduct

and to request discovery allowing them to evaluate the effect of the withheld evidence on their pleas.  *See* ECF No. 41, *Bizzack*, 19-cr-10222.  And several defendants undergoing sentencing have requested extensions to process the implications of the Government's malfeasance.  *See* ECF Nos. 924, 939, 941.  Rightly so:  Even "*good* faith" "[p]rosecutorial misrepresentations . . . are not acceptable" in plea bargaining—and the bad faith tactics used here are far worse.  *Correale v. United States*, 479 F.2d 944, 947 (1st Cir. 1973) (emphasis added); *see also Ferrara v. United States*, 456 F.3d 278, 291 (1st Cir. 2006) (outrageous government misconduct involving failure to disclose exculpatory evidence in violation of due process renders a guilty plea involuntary).

*Third*, while the Government was itself improperly withholding exculpatory evidence, it did its best to ensure Defendants did not obtain exculpatory evidence from other sources either.  When Defendant Zangrillo sought such evidence from USC, the Government supported USC's efforts to quash Zangrillo's requests.  The Government argued his requests had "absolutely nothing to do with this case," labeled them "ridiculous" and "a complete side show, completely unrelated to the issues at hand," and even said it would move to exclude the as-of-yet-unproduced evidence at trial if it were produced.  ECF No. 572 at 70, 72.

Magistrate Judge Kelley rejected those arguments out of hand.  As she explained, the materials Zangrillo sought "are *[h]ighly* [r]elevant to the [d]efense," and "[t]here is *no question* that [the] materials . . . must be produced."  *United States v. Zangrillo*, No. 19-cr-10080, 2020 WL 1027815, at *7 (D. Mass. Mar. 3, 2020) (emphasis added).  The unredacted USC evidence Zangrillo sought "strongly refute[s] the inference the [G]overnment hopes to draw," namely that monetary donations and admissions are not tightly intertwined at USC.  *Id.* at *8; *see also id.* at *4 n.8 (further noting that Government's fraud theory rests on "*open question*" of "[w]hether a donation to the school that does not directly enrich the employee can even constitute a bribe under

30

an honest services theory" (emphasis added)).  The Government's refusal to conduct itself fairly thus extends well beyond the misconduct that is the focus of this motion.

## III.   THE GOVERNMENT'S MISCONDUCT WARRANTS SERIOUS SANCTIONS

The purpose of a criminal trial is to "ascertain[] the *truth* about criminal accusations." *Kyles*, 514 U.S. at 439-40 (emphasis added).  The Government's conduct and tactics suggest it has lost sight of that purpose.  In Defendants' view, the unrebutted misconduct detailed above is serious enough to warrant dismissal of the indictment.  Defendants nonetheless recognize that significant questions about the scope and extent of the Government's misconduct remain unanswered.  Given those factual uncertainties, if the Court is not inclined to dismiss the indictment at this time, Defendants ask this Court to order (1) suppression of all the tainted consensual recordings, and (2) discovery and an evidentiary hearing so that all the relevant facts can come to light.

### A.   The Indictment Should Be Dismissed

Dismissal for governmental misconduct is an extreme sanction "reserved for the most appalling and egregious situations."  *Guzman*, 282 F.3d at 59.  It requires the defendant to show that "the challenged conduct violates commonly accepted norms of fundamental fairness and is shocking to the universal sense of justice."  *Id.*  Although prejudice to the defense is part of the inquiry, it is not a strict requirement if the Government's misconduct is sufficiently "outrageous." *United States v. Therrien*, 847 F.3d 9, 15 n.8 (1st Cir. 2017); *see also United States v. Rossetti*, 768 F.2d 12, 15 (1st Cir. 1985) (stating that prejudice "could" be required "[d]epending on the seriousness of the government's misconduct").

Here, the unrebutted record developed shows outrageous Government conduct warranting dismissal.  For the entire year this case has been pending, the Government knowingly withheld evidence that Defendants repeatedly requested and that supported Defendants' innocence and

undermined the consensual recordings—one of the Government's most valued pieces of evidence. At the same time, the Government repeatedly told Defendants and this Court that no such evidence existed and that no exculpatory evidence was being withheld. The recently disclosed evidence also indicates that government agents knowingly fabricated incriminating evidence (and selectively excluded exculpatory evidence) by coercing their principal informant into lying on recorded phone calls, and conveniently failed to preserve obviously relevant forms of evidence.

Crucially, despite numerous opportunities (and requests by Defendants) to address these allegations, the Government has not denied their accuracy. The Government has refused to provide anything more than a chronology to its production of the notes—and that chronology only raises more questions. *See* 3/19/20 Letter, Ex. OO; Ex. N. The Government has not even said it investigated the allegations, either upon learning of them 16 months ago or in response to Defendants' prodding. And in light of its tactics throughout this case, the Government's misconduct appears to have been part of a concerted effort to coax Defendants into pleading guilty and prevent them from mounting an effective defense.

To be sure, there may be time for Defendants to incorporate the recently disclosed evidence into their trial strategies. But the Government's all-too-convenient failure to monitor all of Singer's communications with Defendants ensures that cross-examination cannot cure the taint caused by its misconduct. And this case has been pending for *a year*. Discovery should be winding down, yet the Government is only now producing evidence that should have been disclosed 10 months ago. Its obstinacy and misconduct forced Defendants and their counsel to expend large amounts of time and expense solely to have the Government comply with its obligations.

Based on the extent of the Government's misconduct—and because the evidence shows "willful misrepresentations or bad faith," *United States v. Richman*, 600 F.2d 286, 291-92 (1st Cir.

1979)—dismissal is warranted.  *See United States v. Pollock*, 417 F. Supp. 1332, 1349 (D. Mass. 1976) (dismissing indictment because "bad faith attempts to destroy or tamper with evidence material to a defendant's guilt or innocence . . . passes beyond the line of tolerable human imperfection and falls into the realm of fundamental unfairness"); *United States v. Diabate*, 90 F. Supp. 2d 140 (D. Mass. 2000) (pattern of misconduct justified dismissal).

> **B.    At A Minimum, The Court Should Suppress The Consensual Recordings And Order An Evidentiary Hearing To Examine The Misconduct**

If the Court concludes that the current record does not warrant dismissal, it should nonetheless suppress all of the tainted consensual recordings involving Singer and his clients.  The First Circuit has acknowledged that courts' supervisory powers authorize them to suppress tainted evidence.  *See Horn*, 29 F.3d at 766-67.  And on the current record, it is more likely than not that the consensual recordings the Government has relied on throughout this prosecution contain fabricated inculpatory evidence.  *See supra* at 15-17.  Use of the consensual recordings thus violates Defendants' due-process rights.  *See Limone*, 372 F.3d at 44-45; *United States v. Marshank*, 777 F. Supp. 1507, 1522 (N.D. Cal. 1991) ("Suppression is an appropriate remedy where the court can identify and isolate the evidence obtained in violation of the defendant's Fifth Amendment due process rights.").

If that were not enough, the record illustrates a pattern of deliberate Government misconduct that spans back to before this case was even charged:  failing to investigate allegations of fabricated evidence, allowing Singer to destroy evidence, withholding exculpatory evidence, knowingly deceiving Defendants and the Court—all coupled with the scorched-earth prosecutorial tactics described above.  Application of the Court's supervisory powers is thus urgently needed to preserve the integrity of this proceeding and "secure enforcement of 'better prosecutorial practice[s],'" both here and in the future.  *Horn*, 29 F.3d at 760.  And suppression is particularly

suited for that purpose.  That remedy "is calculated to prevent, not to repair.  Its purpose is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it." *Elkins v. United States*, 364 U.S. 206, 217 (1960); *cf* Fed. R. Evid. 403 (exclusion of relevant evidence is appropriate if its "probative value is substantially outweighed by a danger of . . . unfair prejudice . . . [or] misleading the jury").

The Court should also order an evidentiary hearing directed at the significant questions about the scope and extent of the Government's misconduct that remain unanswered.  These include questions about (1) the specifics of Singer's interactions with the agents as described in the October 2 note; (2) whether the agents acted inappropriately in other parts of the investigation; (3) what steps (if any) were taken to investigate or address the conduct Singer described in the note; (4) who else on the prosecution team was aware of or involved in the withholding of Singer's notes; (5) on what basis the prosecution formed its asserted belief that the notes were privileged; and (6) what other evidence the Government is unilaterally withholding on the basis of a privilege. To facilitate that hearing, the Court should allow Defendants to obtain tailored discovery into these and other relevant topics.

The First Circuit has explained that an evidentiary hearing is appropriate "if the movant makes a sufficient threshold showing that material facts are in doubt or dispute, and that such facts cannot reliably be resolved on a paper record." *United States v. Staula*, 80 F.3d 596, 603 (1st Cir. 1996).  "Most importantly, the defendant must show that there are factual disputes which, if resolved in his favor, would entitle him to the requested relief." *Id.*; *see also LaFrance v. Bohlinger*, 499 F.2d 29, 35 (1st Cir. 1974) (courts must "protect[] the accused against pretrial illegality by denying to the government the fruits of its exploitation of any deliberate and unnecessary lawlessness on its part" and conduct necessary inquiry when presented with

substantial claim of such conduct); *United States v. Merlino*, 2000 WL 294880, at *2 (D. Mass. Mar. 10, 2000) (granting hearing where defendant identified material disputes).

Here, the factual questions outlined above satisfy this standard. Even if the Court believes that dismissal or suppression is not yet warranted, resolution of these questions would directly inform its consideration of that issue. Further evidence that the consensual recordings were orchestrated to entrap defendants by having them acquiesce to false inculpatory statements would confirm that dismissal or suppression is warranted. If the evidentiary hearing revealed that additional prosecution members were involved in the withholding of the notes, that too could justify dismissal or other evidentiary sanctions. And the Court is also authorized to order discovery to assist in resolving these questions. *See* Fed. R. Crim. P. 16(d)(2)(D) (court may "enter any other order that is just under the circumstances" for violations of Rule 16's disclosure obligations); L.R. 83.6.5(g) (in matters of alleged attorney misconduct, "[t]he presiding judge shall order such discovery as may be reasonably necessary to ensure that the proceeding is fair to all parties").

## CONCLUSION

Undersigned counsel are committed to the criminal justice system and have proudly served as prosecutors and defense lawyers for many years. It brings no joy to file a motion of this nature. But the extraordinary Government misconduct presented in this case threatens grave harm to Defendants and the integrity of this proceeding. That misconduct cannot be ignored.

Defendants respectfully ask the Court to dismiss the Fourth Superseding Indictment with prejudice or, in the alternative, to suppress the Government's consensual recordings and order discovery and an evidentiary hearing on the matters raised herein.

Dated:  March 25, 2020

Respectfully submitted,

_/s/ William J. Trach_

Sean M. Berkowitz (*admitted pro hac vice*)
LATHAM & WATKINS LLP
330 North Wabash Avenue
Suite 2800
Chicago, IL 60611
Phone: 312.777.7700
Fax: 312.993.9767
sean.berkowitz@lw.com

William J. Trach (BBO #661401)
LATHAM & WATKINS LLP
200 Clarendon Street
Boston, MA 02116
Phone: 617.948.6000
Fax: 312.993.9767
william.trach@lw.com

Perry J. Viscounty (*admitted pro hac vice*)
LATHAM & WATKINS LLP
650 Town Center Drive
20th Floor
Costa Mesa, CA 92626
Phone: 714.540.1235
perry.viscounty@lw.com

Roman Martinez (*admitted pro hac vice*)
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
Phone: 202.637.2200
roman.martinez@lw.com

*Counsel for Mossimo Giannulli and Lori Loughlin*

George W. Vien (BBO #547411)
Joshua N. Ruby (BBO #679113)
DONNELLY, CONROY & GELHAAR, LLP
260 Franklin Street, Suite 1600
Boston, MA 02110
Phone: 617.720.2880
Fax: 617.720.3554
gwv@dcglaw.com
jnr@dcglaw.com

David C. Scheper (*admitted pro hac vice*)
SCHEPER KIM & HARRIS LLP
601 West Fifth Street, 12th Floor
Los Angeles, CA 90071
Phone: 213.613.4655
Fax: 213.613.4656
dscheper@scheperkim.com

*Counsel for Lori Loughlin*

Mark E. Beck (*admitted pro hac vice*)
Mark Beck Law, A Professional Corporation
350 West Colorado Boulevard
Suite 200
Pasadena, CA 91105
Phone: 213.596.7828
mbeck@markbecklaw.com

*Counsel for Mossimo Giannulli*

/s/ Brian T. Kelly
Brian T. Kelly (BBO No. 549566)
Joshua C. Sharp (BBO No. 681439)
Lauren M. Maynard (BBO No. 698742)
NIXON PEABODY LLP
53 State Street
Boston, MA 02109
617-345-1000
bkelly@nixonpeabody.com
jsharp@nixonpeabody.com
lmaynard@nixonpeabody.com

Robert Sheketoff (BBO No. 457340)
One McKinley Square
Boston, MA 02109
617-367-3449

*Counsel for Gamal Abdelaziz*

/s/ David S. Schumacher
David S. Schumacher (BBO #647917)
HOOPER, LUNDY & BOOKMAN, P.C.
470 Atlantic Avenue, Suite 1201
Boston, MA 02210
(617) 532-2700
(617) 345-3927 (fax)
dschumacher@health-law.com

Patric Hooper (*pro hac vice*)
HOOPER, LUNDY & BOOKMAN, P.C.
1875 Century Park East, Suite 1600
Los Angeles, California 90067-2517
(310) 551-8111
(310) 551-8181 (fax)
phooper@health-law.com

Jordan Kearney (*pro hac vice*)
HOOPER, LUNDY & BOOKMAN, P.C.
575 Market Street, Suite 2300
San Francisco, CA 94105
(415) 875-8500
(415) 875-8519 (fax)
jkearney@health-law.com

*Counsel for Amy and Gregory Colburn*

/s/ David E. Meier
David E. Meier (BBO #341710)
Todd & Weld LLP
One Federal Street, 27th Floor
Boston, MA 02110
(617) 720-2626
dmeier@toddweld.com
/s/ Stephen H. Sutro
Stephen H. Sutro, Esq.
Duane Morris, LLP
Spear Tower
One Market Plaza, Suite 2200
San Francisco, CA 94105-1127
(415) 957-3008
SHSutro@duanemorris.com

*Counsel for Diane Blake and Todd Blake*

/s/ Reuben Camper Cahn
Reuben Camper Cahn (*pro hac vice*)
KELLER/ANDERLE LLP
18300 Von Karman Avenue, Suite 930
Irvine, CA 92612
Tel. (949) 476-8700
rcahn@kelleranderle.com

*Counsel for I-Hsen "Joey" Chen*
/s/ R. Robert Popeo
R. Robert Popeo (BBO # 403360)
Mark E. Robinson (BBO # 423080)
Eóin P. Beirne (BBO # 660885)
Cory S. Flashner (BBO # 629205)
MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY AND POPEO, P.C.
One Financial Center
Boston, MA 02111
(617) 348-1605 (telephone)
(617) 542-2241 (fax)
rpopeo@mintz.com
mrobinson@mintz.com
ebeirne@mintz.com
csflashner@mintz.com

*Counsel for Elisabeth Kimmel*

/s/ Jack W. Pirozzolo
Jack W. Pirozzolo (BBO # 564879)
jpirozzolo@sidley.com
SIDLEY AUSTIN LLP
60 State Street, 36th Floor
Boston, MA 02109
(617) 223-0304

John C. Hueston (*pro hac vice*)
jhueston@hueston.com
Marshall Camp (*pro hac vice*)
mcamp@hueston.com
HUESTON HENNIGAN LLP
523 W. 6th Street, Suite 400
Los Angeles, CA 90014
(213) 788-4340

*Counsel for William McGlashan, Jr.*

/s/ Michael Kendall
Michael Kendall (BBO # 544866)
Yakov Malkiel (BBO # 689137)
WHITE & CASE LLP
75 State Street
Boston, MA 02109-1814
Telephone: (617) 979-9310
michael.kendall@whitecase.com
yakov.malkiel@whitecase.com

Andrew E. Tomback (*pro hac vice*)
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 819-8428
andrew.tomback@whitecase.com

*Counsel for John Wilson*

/s/ Michael K. Loucks
Michael K. Loucks (BBO #305520)
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
500 Boylston Street
Boston, MA 02116
(617) 573-4800
michael.loucks@skadden.com

Jack P. DiCanio (*pro hac vice*)
Allen J. Ruby (*pro hac vice*)
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
525 University Avenue
Palo Alto, CA 94301
(650) 470-4500
jack.dicanio@skadden.com
allen.ruby@skadden.com

*Counsel for Defendant Marci Palatella*

/s/ Martin G. Weinberg
Martin G. Weinberg
Mass. Bar No. 519480
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
owlmgw@att.net

Matthew L. Schwartz (*admitted pro hac vice*)
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, NY 10001
Tel.: (212) 446-2300
Fax: (212) 446-2350
E-mail:  mlschwartz@bsfllp.com

*Counsel for Robert Zangrillo*

/s/ Tracy A. Miner
Tracy A. Miner (BBO No. 547137)
Megan A. Siddall (BBO No. 568979)
Miner Orkand Siddall LLP
470 Atlantic Ave, 4th Floor
Boston, MA 02110
Tel.: (617) 273-8377
Fax: (617) 273-8004
tminer@mosllp.com
msiddall@mosllp.com

*Counsel for Homayoun Zadeh*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing document, which was filed with the Court through the CM/ECF system, will be sent electronically to all registered participants as identified on the Notice of Electronic Filing and that paper copies will be sent to those identified as non-registered participants.

_/s/ William J. Trach_
William J. Trach
