# United States Court of Appeals
## For the First Circuit

No. 21-1421

UNITED STATES OF AMERICA,

Appellee,

v.

WILLIAM McGLASHAN, JR.,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge]

Before

Gelpí, Howard, and Thompson,
Circuit Judges.

Carter G. Phillips, with whom Jack W. Pirozzolo, Daniel J.
Feith, John L. Gibbons, Sidley Austin LLP, John C. Hueston, and
Hueston Hennigan LLP were on brief, for appellant.
Alexia R. De Vincentis, Assistant United States Attorney,
with whom Nathaniel R. Mendell, Acting United States Attorney, was
on brief, for appellee.

August 14, 2023

**HOWARD**, **Circuit Judge**.  In this appeal involving the scope of the federal wire fraud statute, 18 U.S.C. § 1343, defendant-appellant William McGlashan, Jr., argues in part that the indictment against him should have been dismissed for aiming at a property interest that was not the object of his fraud.  We, however, conclude that the relevant property alleged in the indictment was indeed an object of his fraud, and McGlashan's other arguments either are superfluous to our decision or have been waived.  We therefore affirm the judgment of the district court.

**I.**

We briefly summarize the factual background and procedural posture of the case, as relevant to McGlashan's appeal.  "Ordinarily, because this appeal follows a guilty plea, we would derive the facts from the plea agreement, the change-of-plea colloquy, the unchallenged portions of the presentence investigation report, and the sentencing hearing transcript." United States v. Parigian, 824 F.3d 5, 8 (1st Cir. 2016); see also United States v. Díaz-Rivera, 957 F.3d 20, 22 (1st Cir. 2020). However, "because [McGlashan's] appeal trains solely on the legal adequacy of the challenged superseding indictment, we focus our review within th[at] indictment's four corners."  Parigian, 824 F.3d at 8.

**A.**

Along with fourteen other parents, McGlashan was named as a defendant in an indictment that resulted from "Operation Varsity Blues" (the "Operation"), an investigation into alleged fraudulent schemes designed to secure the defendants' children's admission to elite universities throughout the United States. As is most relevant to this appeal, McGlashan's involvement in the scheme charged in this case boils down to paying $50,000 to have an ACT proctor change his son's test answers in order to increase his son's ACT score.[1]

The ACT exam is a "standardized test that is widely used as part of the college admissions process in the United States," and is run by ACT, Inc. ("ACT"), an Iowa-based nonprofit organization. As noted in the indictment, "[m]ost selective colleges and universities in the United States require prospective students to submit standardized test scores . . . as part of their application packages," and these "scores are a material part of the admissions process." The ACT exam is administered by proctors who the indictment alleges "are agents of ACT[, Inc.][,] . . . [who] owe a duty of honest services to th[at]

---

[1] The indictment also alleges that McGlashan participated in a scheme to falsify his son's athletic credentials in an attempt to have him admitted to the University of Southern California ("USC") as a "purported football recruit." However, this scheme is not at issue in the instant appeal because McGlashan only pleaded guilty to the ACT-related fraud.

organization[]."  Before administering the exam, the proctors "must typically certify" that they will abide by the ACT Administration Manual and "ensure that 'the test materials are kept secure and confidential, used [by each] examinee only, and returned to ACT immediately after testing.'"  The exam is "typically administered to large groups of students on specified dates and under strict time limits," but "students with certain learning or other disabilities may qualify for testing accommodations, . . . and, in such circumstances, may take the test alone, under the supervision of a test administrator retained by ACT, Inc. . . . ."

The indictment alleges that McGlashan agreed in fall 2017 to direct $50,000 to a nonprofit corporation founded by William "Rick" Singer -- the principal organizer of the schemes implicated in the Operation -- as a "purported donation" in exchange for Singer arranging for a test proctor who would correct his son's exam answers.  Singer instructed McGlashan to send a "Request for Arranged Testing" form to ACT, so that McGlashan's son would take the exam at a school in West Hollywood, California, rather than at his own high school.  Having McGlashan's son take the ACT exam at the West Hollywood school was crucial to the plan, since it is alleged that Singer "bribed" Igor Dvorskiy -- the director of the school and "a compensated standardized test administrator for ACT, Inc." -- to allow a proctor to correct

McGlashan's son's test answers.  Singer did so by "caus[ing]" the same nonprofit to which McGlashan had directed the $50,000 to pay both Dvorskiy and the proctor for their role in "facilitating [the] cheating."

All went to plan, at least initially.  McGlashan's son took the ACT exam at the West Hollywood school on December 9, 2017, and the test proctor duly corrected his answers thereafter.  Dvorskiy sent the exam materials to ACT's Iowa headquarters several days later via Federal Express.  Singer then paid Dvorskiy $40,000 and the proctor $35,000 through the above-mentioned nonprofit later that month for their respective services "for McGlashan's son and other students."  After his son's ACT score was released in early January, McGlashan texted Singer that "[y]ou have a very relieved and motivated young man!  Very grateful."  The score was ultimately sent to several colleges -- including Northeastern University, located in Massachusetts -- on October 24, 2018.

### B.

On January 14, 2020, a grand jury sitting in the District of Massachusetts charged McGlashan in the Fourth Superseding Indictment -- the operative indictment in this appeal -- with (1) conspiracy to commit mail and wire fraud, in violation of 18 U.S.C. § 1349 (Count One); (2) conspiracy to commit federal programs bribery prohibited by 18 U.S.C. § 666(a)(2), in violation of 18 U.S.C. § 371 (Count Two); (3) money laundering conspiracy, in

violation of 18 U.S.C. § 1956(h) (Count Three); and (4) wire fraud and honest services wire fraud, and aiding and abetting the same, in violation of 18 U.S.C. §§ 1343, 1346, and 2 (Count Seven). Count Seven specifically alleges -- as is most relevant to this appeal -- that McGlashan:

> having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property, to wit, ACT . . . standardized tests and test scores, . . . by means of materially false and fraudulent pretenses, representations, and promises, and to defraud and deprive [] ACT, Inc., . . . of [its] right to the honest and faithful services of [its] test administrators . . . through bribes and kickbacks, did transmit and cause to be transmitted, by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures and sounds for the purpose of executing the scheme to defraud[:] [the "ACT scores sent to Northeastern University" on or around October 24, 2018].

Thus, in Count Seven, the indictment alleges that McGlashan participated in a fraudulent scheme to obtain tests and test scores from ACT, and that, through bribes and kickbacks, he sought to deprive ACT of the "honest services" of its test administrators.

In moving to dismiss Count Seven, McGlashan advanced three arguments related to the allegations of fraud against ACT: (1) ACT test scores cannot constitute "money or property" under the wire fraud statute, because they do not constitute items that have "long been recognized as property," Carpenter v. United

States, 484 U.S. 19, 26 (1987); (2) the indictment did not
adequately allege a scheme to obtain standardized tests; and (3)
the indictment's description of Dvorskiy's responsibilities as an
ACT test administrator did not give rise to a fiduciary
relationship for purposes of the honest-services theory.  The
district court denied his motion.

McGlashan ultimately entered a conditional guilty plea
to Count Seven on February 10, 2021.  His plea agreement stipulated
that he pleaded guilty to that count "insofar as [it] charges a
scheme and artifice to defraud ACT, Inc., of standardized tests
and test scores, and of its right to the honest and faithful
services of its test administrators."  Nevertheless, the plea
agreement preserved McGlashan's right to appeal the denial of his
motion to dismiss the indictment based on the following arguments:

> [F]irst, that test scores cannot, as a matter
> of law, constitute property for purposes of
> the mail or wire fraud statutes, and that, to
> the extent that standardized tests might be
> considered property under the mail or wire
> fraud statutes, the indictment did not
> adequately allege facts establishing a scheme
> to fraudulently obtain standardized tests in
> this case; and second, that the indictment did
> not adequately allege facts establishing that
> test administrators owed a fiduciary duty to
> testing companies in this case.

The agreement allows McGlashan to withdraw his guilty plea should
his appeal succeed.  This appeal followed.

## II.

"In reviewing a district court's denial of a motion to dismiss an indictment, we review legal questions de novo, any relevant factual findings for clear error, and the court's 'ultimate ruling' for abuse of discretion." Parigian, 824 F.3d at 9 (quoting United States v. Doe, 741 F.3d 217, 226 (1st Cir. 2013)). Whether the facts put forth in an indictment suffice to allege a federal crime is a question of law that we review de novo. See United States v. Brissette, 919 F.3d 670, 676 (1st Cir. 2019) ("'Because the district court's ruling was a legal determination based on its interpretation of [a federal criminal statute] and relevant case law,' we proceed to 'reviewing the District Court's conclusion de novo.'" (cleaned up) (first quoting United States v. Hall, 20 F.3d 1084, 1088 (10th Cir. 1994), then quoting United States v. Musso, 914 F.3d 26, 30 (1st Cir. 2019))).

As earlier observed, Count Seven charges a scheme incorporating two theories of wire fraud: (1) a scheme and artifice to defraud ACT of its test and test scores under 18 U.S.C. § 1343, and (2) a scheme or artifice to deprive ACT of its right to the honest services of its test administrators under 18 U.S.C. § 1346. We need only find one of these theories valid to affirm the judgment of the district court. Cf. United States v. Abdelaziz, 68 F.4th 1, 26 n.14 (1st Cir. 2023) ("[W]hen the government has advanced several alternate theories of guilt and the trial court

- 8 -

has submitted the case to the jury on that basis, an ensuing conviction may stand as long as the evidence suffices to support any one of the submitted theories." (quoting United States v. Celestin, 612 F.3d 14, 24 (1st Cir. 2010))); United States v. Ayala, 289 F.3d 16, 22 (1st Cir. 2002) ("[C]onvictions generally have been sustained as long as the proof upon which they are based corresponds to an offense that was clearly set out in the indictment.   A part of the indictment unnecessary to and independent of the allegations of the offense proved may normally be treated as a useless averment that may be ignored." (quoting United States v. Miller, 471 U.S. 130, 136 (1985))).

### III.

McGlashan's challenge to the indictment's first wire fraud theory rests on two grounds.   First, he contends that ACT scores cannot constitute "money or property" for purposes of the wire fraud statute.   Second, he asserts that the indictment does not adequately allege a scheme having the object of obtaining standardized tests.   In challenging the second theory, he argues that "informal" fiduciary relationships of the variety that the indictment alleges Dvorskiy had with ACT do not suffice for the purposes of honest services wire fraud.   As noted above, if any of the grounds advanced by McGlashan fails, then the indictment is legally sufficient and the conviction stands.   We therefore bypass the challenge based on the argument that ACT scores are not

"property" as contemplated by the statute and train our analysis on the more straightforward issues of whether attaining ACT standardized tests is adequately alleged as a legally sufficient object of the scheme and whether a cognizable fiduciary relationship has been alleged.[2]

**A.**

The federal wire fraud statute prohibits "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises" through interstate or foreign wires. 18 U.S.C. § 1343. In order to prove a violation of the statute, the government must show "(1) a scheme or artifice to defraud using false or fraudulent pretenses; (2) the defendant's knowing and willing participation in the scheme or artifice with the intent to defraud; and (3) the use of the interstate wires in furtherance of the scheme." United States v. Pena, 910 F.3d 591, 596 (1st Cir. 2018) (quoting United States v. Appolon, 715 F.3d 362, 367 (1st Cir. 2013)). In

---

[2]  We also opt not to address McGlashan's first argument in recognition of the fact that the legal landscape with regard to the scope of property rights protected by the wire fraud statute has significantly changed since the parties addressed the issue in their briefing to us, most notably through the Supreme Court's decision in Ciminelli v. United States, 143 S. Ct. 1121 (2023), and our own court's decision in Abdelaziz. See also PDK Lab'ys, Inc. v. U.S. Drug Enf't Admin., 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring) ("[T]he cardinal principle of judicial restraint -- if it is not necessary to decide more, it is necessary not to decide more -- counsels us to go no further.").

addition, despite the statute's use of the disjunctive "or" between the phrases "any scheme or artifice to defraud" and "for obtaining money or property," the Supreme Court has "[c]onstru[ed] that disjunctive phrase as a unitary whole" and "held that 'the money-or-property requirement of the latter phrase' also limits the former." Kelly v. United States, 140 S. Ct. 1565, 1571 (2020) (quoting McNally v. United States, 483 U.S. 350, 358 (1987), superseded by statute as recognized in Percoco v. United States, 143 S. Ct. 1130, 1136 (2023)). "The wire fraud statute thus prohibits only deceptive 'schemes to deprive [the victim of] money or property.'" Id. (alteration in original) (quoting McNally, 483 U.S. at 356).

McGlashan contends that the indictment did not adequately allege a scheme to defraud ACT of its standardized tests. Relying on Kelly, he submits that the exam was a "mere implementation cost" of his scheme, and not an "object of the fraud."

In Kelly, the Supreme Court reversed the wire fraud convictions of New Jersey public officials who -- in a scandal commonly known as "Bridgegate" -- aimed to punish the mayor of Fort Lee, New Jersey, "for refusing to support the New Jersey Governor's reelection bid" by reducing the number of lanes of the George Washington Bridge dedicated to traffic from Fort Lee from three to one. Kelly, 140 S. Ct. at 1568, 1570. The scheme

necessitated hiring backup toll collectors who could operate a
toll booth during the on-duty collector's breaks, in order to
ensure that the single remaining lane would remain continuously
open.  Id. at 1570.  The officials also concocted a traffic study
to cover up the scheme; this study required the hiring of traffic
engineers.  Id.  The government's wire fraud theory was predicated
in part on the idea that the "defendants aimed to deprive the Port
Authority [of New York and New Jersey (i.e., the government agency
in charge of the bridge)] of the costs of compensating the traffic
engineers and back-up toll collectors who performed work relating
to the lane realignment."  Id. at 1572.  A unanimous Court rejected
this theory, since "property must play more than some bit part in
a scheme: it must be an 'object of the fraud.' . . . [A] property
fraud conviction cannot stand when the loss to the victim is only
an incidental byproduct of the scheme."  Id. at 1573 (quoting
Pasquantino v. United States, 544 U.S. 349, 355 (2005)).  The Court
found that the "time and labor" of the engineers and backup toll
collector did not constitute an object of the fraud, because
"[n]either defendant sought to obtain the services that the[se]
employees provided"; they "did nothing [the defendants] thought
useful."  Id. at 1573-74.  The Court explicitly held so with
federalism concerns in mind:

> Every regulatory decision . . . requires the
> use of some employee labor. But that does not
> mean every scheme to alter a regulation has

> that labor as its object. . . . To rule
> otherwise would undercut this Court's oft-
> repeated instruction: Federal prosecutors may
> not use property fraud statutes to "set[]
> standards of disclosure and good government
> for local and state officials."

Id. at 1574 (alteration in original) (quoting McNally, 483 U.S. at 360).

McGlashan urges us to find that obtaining the ACT score was the sole object of his scheme, to the exclusion of the ACT exam itself. He points to the indictment's allegation that one of the "principal purposes" of the scheme was "securing the admission of the defendants' children to selective colleges using fraudulently obtained test scores" to support his claim. In his view, much like the extra toll collectors and engineers' time and labor in Kelly, gaining access to the ACT test was "'needed' to realize the final plan" but ultimately a mere "implementation cost[]" of the scheme. Id. at 1574. He posits that he "was indifferent to obtaining the ACT exam as such," and points out that his son could have simply accessed the test at his high school.

We find McGlashan's arguments unpersuasive, and agree with the government that they "suffer[] from two fundamental flaws." First, as the Second Circuit has concluded, "[d]efendants may have . . . multiple objectives, but property need only be 'an object' of their scheme, not the sole or primary goal." United

States v. Gatto, 986 F.3d 104, 116 (2d Cir. 2021) (emphasis in original) (quoting Kelly, 140 S. Ct. at 1572). Second, and perhaps more importantly, McGlashan's arguments also inappropriately downplay the Kelly Court's emphasis on what the defendant "sought" in differentiating objects of the fraud from "incidental byproduct[s]" or mere "implementation costs[.]" Kelly, 140 S. Ct. at 1574.

Mindful of these precepts, and employing the same holistic analysis that the Supreme Court used in Kelly (as McGlashan concedes) to parse the objects of his scheme, we are left with little doubt that the indictment adequately alleges that the ACT test was an object of the fraud. Kelly, 140 S. Ct. at 1574. The indictment provides ample evidence to support the proposition that McGlashan actively sought to obtain the ACT test in the way Singer had devised, and not just the scores. To that end, the $50,000 that he spent for the scheme covered not only the cost of increasing the test score, but -- just as crucially -- the cost of ensuring that the right proctor (namely, one who would be willing to facilitate the cheating) would both administer and then access the exam materials themselves. It was that need that underpinned the payment to Singer -- indeed, the indictment points to the fact that the invoice that Singer's accountant emailed McGlashan for the $50,000 explicitly said it was "[r]egarding [the West Hollywood Testing Center][.]" Had the "entire point" of the

scheme been merely to increase his son's test scores, McGlashan could have, for example, simply paid Singer to forge a score report or even hack the ACT website to change the report.  Kelly, 140 S. Ct. at 1573.  Such a plan might not have even required McGlashan's son to take the exam.

But McGlashan's plan proved much more intricate than merely tampering with the scores.  Rather, the "entire point" of the plan -- the "alternative strategy," as the indictment notes McGlashan told "a counselor at his son's high school" -- was to pay for a proctor to access the exam materials in order to change McGlashan's son's test answers, which in turn would increase his son's test score.  This scenario is easily distinguishable from the traffic study in Kelly, which the Court explicitly noted was "a cover story" meant to provide a pretext for the political retribution behind the lane closures, or the extra toll collectors, who one of the defendants "joked would just 'sit there and wait.'" Kelly, 140 S. Ct. at 1574.  Here, by contrast, obtaining the ACT exam in the manner Singer had devised was not pretextual, but rather was a core service for which McGlashan paid tens of thousands of dollars.  McGlashan was thus far from indifferent toward obtaining the test itself; as alleged in the indictment, doing so was not "some bit part in [the] scheme" at which he did not aim.  Kelly, 140 S. Ct. at 1573; see also Gatto, 986 F.3d at 116 (noting in regards to a plan to conceal payments to college

athletic recruits such that they would remain eligible to compete that "[u]nlike in <u>Kelly</u>, where there was a sham study and additional wages were paid only after the original plan was scaled back due to safety concerns, here, depriving Universities of athletic-based aid was at the <u>center</u> of the plan" (emphasis in original) (citing <u>Kelly</u>, 140 S. Ct. at 1574)).  We therefore conclude that the indictment did adequately allege a scheme in which the ACT exam was an object of the fraud.

**B.**

McGlashan also argues that the indictment does not allege a cognizable fiduciary relationship for purposes of the honest services wire fraud element of Count Seven.  But this argument is barred by the conditional plea agreement to which McGlashan "knowingly, voluntarily, and intelligently" agreed. <u>United States</u> v. <u>Fernández-Santos</u>, 856 F.3d 10, 14 (1st Cir. 2017).

"While plea agreements are a matter of criminal jurisprudence, most courts, including this one, have held that they are also subject to contract principles." <u>United States</u> v. <u>Vizcarrondo-Casanova</u>, 763 F.3d 89, 102 (1st Cir. 2014) (quoting <u>United States</u> v. <u>Papaleo</u>, 853 F.2d 16, 19 (1st Cir. 1988)).  We construe the plea agreement according to its plain language and aim to "give effect to every term and phrase." <u>United States</u> v. <u>Alegría</u>, 192 F.3d 179, 185 (1st Cir. 1999); <u>see also</u> <u>United States</u> v. <u>Davis</u>, 923 F.3d 228, 235 (1st Cir. 2019) (interpreting a plea

agreement's appellate waiver according to its plain language).
Nevertheless, we "construe ambiguities in favor of allowing the
appeal to proceed." <u>United States</u> v. <u>Morales-Arroyo</u>, 854 F.3d
118, 120 (1st Cir. 2017).

The plea agreement's language includes a careful
distinction between the preservation of factual and legal claims
on appeal. As noted above, the agreement allowed McGlashan to
appeal the district court's denial of his motion to dismiss Count
Seven but expressly dictated that he could only make specified
arguments on appeal. <u>See</u> <u>supra</u> at 7-8. As is relevant here, the
preserved honest services-related argument was that "the
indictment did not adequately allege <u>facts</u> establishing that test
administrators owed a fiduciary duty to testing companies in this
case." The agreement's use of the phrase "did not adequately
allege facts" mirrors the agreement's language concerning
McGlashan's right to advance an argument that "the indictment did
not adequately allege facts establishing a scheme to fraudulently
obtain standardized tests in this case." Indeed, even though the
object of the fraud challenge was predicated on <u>Kelly</u>, the argument
that McGlashan advanced before us required an analysis of the
alleged facts of his scheme in order to assess the alleged role of
the ACT exam. By contrast, the agreement's language preserving a
challenge based on the meaning of property as used in the wire
fraud statute allowed McGlashan to argue on appeal "that test

scores cannot, <u>as a matter of law</u>, constitute property for the purposes of the mail and wire fraud statutes." And McGlashan proceeded to make exactly that argument before us. We would therefore expect that McGlashan's honest services argument would be akin to his object of the fraud claim; namely, an argument that would primarily train on the facts set forth in the indictment and would thus honor the agreement's express distinction between legal and factual claims. <u>Cf.</u> <u>United States</u> v. <u>Okoye</u>, 731 F.3d 46, 49 (1st Cir. 2013) (citing in the context of construing a waiver of appeal provision to <u>Smart</u> v. <u>Gillette Co. Long-Term Disability Plan</u>, 70 F.3d 173, 179 (1st Cir. 1995) ("Accepted canons of construction forbid the balkanization of contracts for interpretive purposes.")); <u>United States</u> v. <u>Donath</u>, 616 F.3d 80, 84 (1st Cir. 2010) ("When enforcing the appellate waiver, we stress that both sides are obligated to live by the bargain they made.").[3]

---

[3] McGlashan argues in response to the government's claim of waiver that the parties' "course of dealing" in their briefing to the district court about the indictment's honest-services theory indicates that, "read in light of the record, the plea agreement preserved [his] challenge" related to the scope of § 1346 on appeal. It is true that he, the government, and the district court did discuss independent contractors, fiduciary duties, and those concepts' application to § 1346 under <u>Skilling</u> v. <u>United States</u>, 561 U.S. 358 (2010), in various ways. But McGlashan overlooks the fact that our court has repeated on a number of occasions that "[i]f the language of an agreement 'unambiguously resolves an issue, that usually ends the judicial inquiry,'" <u>United States</u> v. <u>Mejia</u>, 55 F.4th 1, 7 (1st Cir. 2022) (quoting <u>Alegría</u>, 192 F.3d at 183), and -- consequently -- we typically "look[] outside the document only as necessary to provide illuminating context or resolve ambiguities in the writing," <u>United States</u> v. <u>Marchena-</u>

Despite this limitation in the plea agreement, on appeal about which fiduciary relationships the statute reaches, McGlashan plainly asserts a legal argument.  He summarizes his argument in the following manner:

> [T]he government's theory rests on an alleged informal fiduciary relationship between ACT and Dvorskiy, the test administrator, which supposedly arose from the totality of the circumstances of their arm's-length contractual agreement.  Such relationships, however, are not cognizable under 18 U.S.C. § 1346, the honest services fraud statute, because they fall outside the "core pre-McNally applications" of the honest services doctrine that, per Skilling [v. United States, 561 U.S. 358, 408 (2010)], define that statute's reach.  The theory advanced by the government disregards these limits, creates uncertainty in all manner of business relationships, and, if upheld, would violate due process.

It is true that McGlashan does perfunctorily challenge the indictment's allegations that a fiduciary relationship existed between the test administrators and ACT, characterizing the indictment's theory as "supposedly ar[ising] from the totality of

---

Silvestre, 802 F.3d 196, 202 (1st Cir. 2015).  See also Alegría, 192 F.3d at 183 ("If, however, a plea agreement lacks clarity or is manifestly incomplete, the need to disambiguate may justify resort to supplementary evidence or other interpretive aids.").  As illustrated above, we find no ambiguity here that would warrant resorting to extratextual evidence to construe the agreement.  Cf. United States v. Arroyo-Blas, 783 F.3d 361, 365 (1st Cir. 2015) ("[A]s in contract law, we will not 'conjur[e] up an ambiguity [in a plea agreement] where none legitimately exists.'" (second and third alterations in original) (quoting United States v. Anderson, 921 F.2d 335, 338 (1st Cir. 1990))).  His course of dealing argument is therefore unavailing.

the circumstances of their arm's length contractual agreement" and "allegedly ar[ising] circumstantially from the parties' course of dealing, rather than inhering in their formal legal roles."  But that is also where his fact-based argument ends: the honest services section of his appeal brief mentions "Dvorskiy" and "ACT" only twice each after the summary excerpted above (either by name or by reference), and only spends three sentences discussing the facts of McGlashan's case over the course of ten pages.  This presentation of his argument does not invite us to consider whether the indictment adequately alleged facts that establish a fiduciary relationship between the test administrators and ACT.  To the extent that McGlashan has made a factual argument, "[w]e long have warned that 'issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.'  The skeletal presentation of this argument in the defendant's brief 'leav[es] the court to do counsel's work' -- and that is not our proper province."  United States v. Gonzalez, 981 F.3d 11, 23 (1st Cir. 2020) (second alteration in original) (quoting United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990)).

Rather, McGlashan's argument is premised on his objection to the application of § 1346 to informal fiduciary relationships writ large.  This is further evidenced by the position that McGlashan urges us to take in the conclusion of the honest services section of his brief: he calls for us to "construe

the statute to reach only formal fiduciary relationships, in line with the core pre-<u>McNally</u> applications." Even with his perfunctory statements about Dvorskiy's relationship with ACT, we fail to comprehend how the argument focuses on whether the indictment adequately alleged facts establishing the test administrators' fiduciary duties to ACT. It is instead a legal argument about the scope of § 1346, pure and simple. As noted above, the language of the plea agreement plainly does not allow for legal challenges to the honest services theory included in Count Seven. McGlashan therefore waived this argument when he entered the conditional guilty plea agreement.

**<u>Affirmed</u>**.